## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| THE UNITED STATES OF AMERICA and THE STATES OF CALIFORNIA, COLORADO, CONNECTICUT, DELAWARE, FLORIDA, GEORGIA, HAWAII, ILLINOIS, INDIANA, IOWA, LOUISIANA, MARYLAND, MICHIGAN, MINNESOTA, MONTANA, NEVADA, NEW JERSEY, NEW MEXICO, NEW YORK, NORTH CAROLINA, OKLAHOMA, RHODE ISLAND, TENNESSEE, TEXAS, WASHINGTON, and WISCONSIN; THE COMMONWEALTHS OF MASSACHUSETTS and VIRGINIA, and THE DISTRICT OF COLUMBIA, *ex rel.* MICHELE CLARKE, TRICIA MULLINS, and KRISTI WINGER SZUDLO, <br><br> Plaintiffs, <br><br> v. <br><br> AEGERION PHARMACEUTICALS, INC., MARC BEER, MELANIE DETLOFF, WILLIAM DULL, GREG FENNER, MARK FITZPATRICK, CRAIG FRASER, JAMES FRIGGE, DANIEL RADER, DAVID SCHEER, MARK SUMERAY, and THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA <br><br> Defendants. | CIVIL ACTION NO.: 13-cv-11785-IT <br><br><br> ***Leave to File Granted on September 22, 2017 (Docket # 64)*** <br><br> **JURY TRIAL DEMANDED** |

## SECOND AMENDED COMPLAINT

TABLE OF CONTENTS

PAGE

I.      INTRODUCTION .........................................................................1

II.     PARTIES .....................................................................................3

III.    JURISDICTION AND VENUE ....................................................6

IV.     HOMOZYGOUS FAMILIAL HYPERCHOLESTEROLEMIA
        ("HoFH") ....................................................................................7

V.      FACTUAL ALLEGATIONS ........................................................10

        A.    Lomitapide, Juxtapid, Aegerion and the Road to
              FDA Approval ...................................................................10

              1.    The Formation of Aegerion ........................................12

              2.    FDA Approval Process ...............................................14

        B.    Post Approval, Juxtapid is Marketed Off-Label ..................21

        C.    Dr. Rader Lends His (and UPenn's) Name to the Promotional
              Scheme ..............................................................................37

        D.    Profits and Sales Soar for Aegerion and UPenn...................40

        E.    Aegerion Crumbles.............................................................46

VI.     FALSE CLAIMS UNDER FEDERAL GOVERNMENT
        HEALTHCARE PROGRAMS ........................................................48

        A.    Federal Reimbursement for Juxtapid ..................................48

        B.    Aegerion Sells Off-Label to Non-HoFH Medicare Patients .................49

              1.    Government Healthcare Program Sales .........................50

              2.    Sales to Non-HoFH Patients ......................................55

        C.    Government Damages Caused by Off-Label Marketing.......58

VII.    DEFENDANTS' JOINT AND SEVERAL LIABILITY ...............59

## TABLE OF CONTENTS

PAGE

VIII.    CAUSES OF ACTION ................................................................................69

FIRST CAUSE OF ACTION
VIOLATION OF 31 U.S.C. § 3729 (a)(1)(A)
(AGAINST AEGERION AND THE INDIVIDUAL DEFENDANTS) .........69

SECOND CAUSE OF ACTION
VIOLATION OF 31 U.S.C. § 3729(a)(1)(B)
(AGAINST AEGERION AND THE INDIVIDUAL DEFENDANTS) .........70

THIRD CAUSE OF ACTION
VIOLATION OF 31 U.S.C. § 3729(a)(1)(C)
(AGAINST THE INDIVIDUAL DEFENDANTS)........................................71

FOURTH CAUSE OF ACTION
CALIFORNIA FALSE CLAIMS ACT
CAL. GOV'T. CODE § 12650, *ET SEQ.*
(AGAINST AEGERION AND THE INDIVIDUAL DEFENDANTS) .........71

FIFTH CAUSE OF ACTION
COLORADO MEDICAID FALSE CLAIMS ACT
CRS § 25.5-4-304, *ET SEQ.*
(AGAINST AEGERION AND THE INDIVIDUAL DEFENDANTS) .........72

SIXTH CAUSE OF ACTION
CONNECTICUT FALSE CLAIMS ACT
CONN. GEN. STAT. ANN. § 4-274, *ET SEQ.*
(AGAINST AEGERION AND THE INDIVIDUAL DEFENDANTS) .........73

SEVENTH CAUSE OF ACTION
DELAWARE FALSE CLAIMS AND REPORTING ACT
6 DEL. CODE § 1201, *ET SEQ.*
(AGAINST AEGERION AND THE INDIVIDUAL DEFENDANTS) .........74

EIGHTH CAUSE OF ACTION
FLORIDA FALSE CLAIMS ACT
FLA. STAT. § 68.081, *ET SEQ.*
(AGAINST AEGERION AND THE INDIVIDUAL DEFENDANTS) .........75

<u>TABLE OF CONTENTS</u>

PAGE

NINTH CAUSE OF ACTION
GEORGIA STATE FALSE MEDICAID CLAIMS ACT
CODE § 49-4-168, *ET SEQ.*
(AGAINST AEGERION AND THE INDIVIDUAL DEFENDANTS) .........76

TENTH CAUSE OF ACTION
HAWAII FALSE CLAIMS ACT
HAW. REV. STAT. § 661-21, *ET SEQ.*
(AGAINST AEGERION AND THE INDIVIDUAL DEFENDANTS) .........77

ELEVENTH CAUSE OF ACTION
ILLINOIS FALSE CLAIMS ACT
740 ILL. COMP. STAT. § 175/1, *ET SEQ.*
(AGAINST AEGERION AND THE INDIVIDUAL DEFENDANTS) .........78

TWELFTH CAUSE OF ACTION
INDIANA FALSE CLAIMS AND WHISTLEBLOWER
PROTECTION ACT
IND. CODE. § 5-11-5.5, *ET SEQ.*
(AGAINST AEGERION AND THE INDIVIDUAL DEFENDANTS) .........79

THIRTEENTH CAUSE OF ACTION
IOWA FALSE CLAIMS ACT
IOWA CODE § 685, *ET SEQ.*
(AGAINST AEGERION AND THE INDIVIDUAL DEFENDANTS) .........80

FOURTEENTH CAUSE OF ACTION
LOUISIANA FALSE CLAIMS ACT/MEDICAL ASSISTANCE PROGRAMS
INTEGRITY LAW
LA. REV. STAT. § 46:437.1, *ET SEQ.*
(AGAINST AEGERION AND THE INDIVIDUAL DEFENDANTS) .........81

FIFTEENTH CAUSE OF ACTION
MARYLAND FALSE HEALTH CLAIMS ACT
MD. CODE ANN., HEALTH-GEN § 2-601, *ET SEQ.*
(AGAINST AEGERION AND THE INDIVIDUAL DEFENDANTS) .........82

SIXTEENTH CAUSE OF ACTION
MASSACHUSETTS FALSE CLAIMS LAW
MASS. GEN. LAWS CH. 12 § 5A, *ET SEQ.*
(AGAINST AEGERION AND THE INDIVIDUAL DEFENDANTS) .........83

# TABLE OF CONTENTS

PAGE

SEVENTEENTH CAUSE OF ACTION
MICHIGAN MEDICAID FALSE CLAIM ACT
MICH. COMP. LAWS § 400.601, *ET SEQ.*
(AGAINST AEGERION AND THE INDIVIDUAL DEFENDANTS) .........84

EIGHTEENTH CAUSE OF ACTION
MINNESOTA FALSE CLAIMS ACT
MINN. STAT. ANN. § 15C, *ET SEQ.*
(AGAINST AEGERION AND THE INDIVIDUAL DEFENDANTS) .........85

NINETEENTH CAUSE OF ACTION
MONTANA FALSE CLAIMS ACT
MONT. CODE ANN. §17-8-401, *ET. SEQ.*
(AGAINST AEGERION AND THE INDIVIDUAL DEFENDANTS) .........86

TWENTIETH CAUSE OF ACTION
NEVADA FALSE CLAIMS ACT
NEV. REV. STAT. §§ 357, *ET SEQ.*
(AGAINST AEGERION AND THE INDIVIDUAL DEFENDANTS) .........87

TWENTY-FIRST CAUSE OF ACTION
NEW JERSEY FALSE CLAIMS ACT
N.J. STAT. ANN. § 2A:32C-1, *ET SEQ.*
(AGAINST AEGERION AND THE INDIVIDUAL DEFENDANTS) .........88

TWENTY-SECOND CAUSE OF ACTION
NEW MEXICO MEDICAID FALSE CLAIMS ACT
N.M. STAT. ANN. § 27-14-1, *ET SEQ.*
(AGAINST AEGERION AND THE INDIVIDUAL DEFENDANTS) .........89

TWENTY-THIRD CAUSE OF ACTION
NEW YORK FALSE CLAIMS ACT
N.Y. STATE FIN. LAW §§ 187, *ET SEQ.*
(AGAINST AEGERION AND THE INDIVIDUAL DEFENDANTS) .........90

TWENTY-FOURTH CAUSE OF ACTION
NORTH CAROLINA FALSE CLAIMS ACT
N.C. GEN. STAT. § 1-605, *ET SEQ.*
(AGAINST AEGERION AND THE INDIVIDUAL DEFENDANTS) .........91

## TABLE OF CONTENTS

PAGE

TWENTY-FIFTH CAUSE OF ACTION
OKLAHOMA MEDICAID FALSE CLAIMS ACT
OKLA. STAT. § 63-5053, *ET SEQ.*
(AGAINST AEGERION AND THE INDIVIDUAL DEFENDANTS) .........92

TWENTY-SIXTH CAUSE OF ACTION
RHODE ISLAND FALSE CLAIMS ACT
R.I. GEN. LAWS § 9-1.1, *ET SEQ.*
(AGAINST AEGERION AND THE INDIVIDUAL DEFENDANTS) .........93

TWENTY-SEVENTH CAUSE OF ACTION
TENNESSEE MEDICAID FALSE CLAIMS ACT
TENN. CODE § 71-5-181, *ET SEQ.*
(AGAINST AEGERION AND THE INDIVIDUAL DEFENDANTS) .........94

TWENTY-EIGHTH CAUSE OF ACTION
TEXAS MEDICAID FRAUD PREVENTION LAW
TEX. HUM. RES. CODE § 36.001, *ET SEQ.*
(AGAINST AEGERION AND THE INDIVIDUAL DEFENDANTS) .........95

TWENTY-NINTH CAUSE OF ACTION
VIRGINIA FRAUD AGAINST TAXPAYERS ACT
VA. CODE § 8.01-216.1, *ET SEQ.*
(AGAINST AEGERION AND THE INDIVIDUAL DEFENDANTS) .........96

THIRTIETH CAUSE OF ACTION
WASHINGTON MEDICAID FRAUD FALSE CLAIMS ACT
WASH. REV. CODE § 74.66.020, *ET SEQ.*
(AGAINST AEGERION AND THE INDIVIDUAL DEFENDANTS) .........97

THIRTY-FIRST CAUSE OF ACTION
WISCONSIN FALSE CLAIMS FOR MEDICAL ASSISTANCE LAW
WIS. STAT. § 20.931, *ET SEQ.*
(AGAINST AEGERION AND THE INDIVIDUAL DEFENDANTS) .........98

THIRTY-SECOND CAUSE OF ACTION
DISTRICT OF COLUMBIA FALSE CLAIMS ACT
D.C. CODE § 2-381.01, *ET SEQ.*
(AGAINST AEGERION AND THE INDIVIDUAL DEFENDANTS) .........99

## TABLE OF CONTENTS

PAGE

THIRTY-THIRD CAUSE OF ACTION
VICARIOUS LIABILITY
(AGAINST UPENN) .................................................................................100

THIRTY-FOURTH CAUSE OF ACTION
UNJUST ENRICHMENT
(AGAINST UPENN) .................................................................................100

IX.    PRAYER FOR RELIEF ............................................................................101

X.     DEMAND FOR JURY TRIAL ...................................................................102

Pursuant to the federal False Claims Act, 31 U.S.C. § 3729, *et seq.*, and certain state false claims statutes, Plaintiffs/Relators Michele Clarke, Tricia Mullins, and Kristi Winger Szudlo (collectively, "Relators"), hereby bring this action on behalf of the United States of America, the District of Columbia (the "District") and 28 States[1] to recover monies wrongfully paid by those entities as a result of the false claims caused by Defendants Aegerion Pharmaceuticals, Inc. ("Aegerion" or the "Company")[2], Marc Beer ("Beer"), Melanie Detloff ("Detloff"), William Dull ("Dull"), Greg Fenner ("Fenner"), Mark Fitzpatrick ("Fitzpatrick"), Craig Fraser ("Fraser"), James Frigge ("Frigge"),  Daniel Rader, M.D. ("Dr. Rader"), David Scheer ("Scheer"), Mark Sumeray, M.D. ("Dr. Sumeray"), and The Trustees of the University of Pennsylvania ("UPenn") (collectively, "Defendants").[3]

# I. <u>INTRODUCTION</u>

1.    This case arises from Defendants' scheme to aggressively off-label market Aegerion's core drug, Juxtapid, and cause false claims to be submitted to Medicare and other government healthcare programs to pay for Juxtapid coverage for unapproved used and non-medically accepted indications.

---

[1] The States on whose behalf the Relators bring this action are: California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Illinois, Indiana, Iowa, Louisiana, Maryland, Massachusetts, Michigan, Minnesota, Montana, Nevada, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Rhode Island, Tennessee, Texas, Virginia, Washington and Wisconsin (collectively with the District, the "Plaintiff States").

[2] Relators name Aegerion as a Defendant.  On September 22, 2017, Relators entered into a Settlement Agreement with Aegerion, the Department of Justice, the Office of Inspector General of the Department of Health and Human Services and the Defense Health Agency acting on behalf of the TRICARE Program (the "Settlement Agreement"), which was an exhibit to a Plea Agreement filed with this District Court in a pending criminal matter.  *See U.S. v. Aegerion Pharmaceuticals, Inc.*, 17-cr-10288, Dkt. No. 2-3 (filed Sept. 22, 2017).  The Settlement Agreement is hereby incorporated by reference.  Pursuant to the Settlement Agreement, it is contemplated that the Relators shall file a Joint Stipulation of Dismissal in this matter with respect to Aegerion, upon the completion of certain conditions therein.

[3] Defendants Beer, Detloff, Dull, Fenner, Fitzgerald, Fraser, Frigge, Dr. Rader, Scheer and Dr. Sumeray are collectively referred to as the "Individual Defendants."

2.      Juxtapid is a cholesterol-lowering drug designed to treat patients with an ultra-rare and dangerous lipid disease: homozygous familial hypercholesterolemia ("HoFH").  HoFH is typically diagnosed in children and, untreated, the average lifespan for persons with HoFH is thirty-three years of age.  Academic literature and prior statements of Aegerion and certain Defendants estimate the prevalence of HoFH to be 1 in a 1,000,000: which equates to roughly 300 people in the United States.

3.      In December 2012, the U.S. Food and Drug Administration ("FDA") approved Juxtapid to treat HoFH *solely*.  The FDA stressed that HoFH was a "rare" condition, and warned against the marketing and sale of Juxtapid beyond the HoFH patient population.

4.      Despite this limited approval, and ignoring the FDA's warnings, Aegerion and the Defendants aggressively marketed Juxtapid well beyond the HoFH population.  In fact, Defendants repeatedly instructed Relators and other Aegerion sales personnel to promote Juxtapid for off-label, non-medically approved uses, intent on increasing Aegerion's customer base beyond the 300-person U.S.-HoFH population.  Defendants' tactics were aggressive and brash.  Indeed, then-Aegerion Chief Executive Officer ("CEO") Beer himself widely promoted Juxtapid for off label uses in repeated television appearances.

5.      Defendants' scheme was wildly successful for a time, but grew too fast.  Within one year of FDA approval, Aegerion and the other Defendants had reached nearly 400 patients, entirely saturating and exceeding the U.S.-based HoFH patient population.  This quick rise, and Defendant Beer's public off-label promotion, eventually drew scrutiny.  By January 2014, Aegerion announced that it had received a subpoena from the U.S. Attorney for the District of Massachusetts relating to off-label marketing.  In response, the Company's stock plummeted from a high of $97 per share in October 2013 to around $2 per share in 2016.  Defendants Beer and

Fraser would abruptly resign and Aegerion would announce a "preliminary agreement" to plead guilty to misbranding under the Food, Drug and Cosmetic Act.

6.      Before Aegerion's demise, Defendants committed a widespread fraud not only on patients, but also on government healthcare programs, including Medicare.  Defendants sold Juxtapid widely to a number of patients whose prescriptions were paid in whole or in part by government healthcare programs.  Moreover, many, if not all, of those patients did not suffer from HoFH and, thus, were prescribed Juxtapid for non-medically accepted indications.

7.       Defendants' actions have caused the submission of false and fraudulent claims to the United States for tens of millions of dollars.  Following the federal government's investigation, Aegerion agreed to pay $40 million to the United States, the Plaintiff States and the Securities and Exchange Commission ("SEC") over five years to settle allegations of off-label marketing.  This sum, even if it is paid in full, will not satisfy the damages to the United States and Plaintiff States accrued under the false claims acts cited herein.  Relators, on behalf of the United States government and the Plaintiff States, now bring this action to hold Defendants accountable for their actions.

## II. **PARTIES**

8.      Relator Michele Clarke ("Relator Clarke") is an individual who resides in Lexington, Massachusetts.  She was employed by Aegerion as a Lipid Specialty Manager ("LSM") for the Boston area, which includes all of Eastern New England, from April 2012 to December 2014.  Relator Clarke has worked in medical device and biotechnology sales for more than twenty-eight years and she has been involved in four company "start-ups" within the industry.  Relator Clarke has held both regional and national sales leadership/marketing roles and has been a marketer for two orphan drugs.

- 3 -

9.     Relator Tricia Mullins ("Relator Mullins") is an individual who resides in Encinitas, California.  She was employed by Aegerion as an LSM for the New York metropolitan area (Manhattan, Brooklyn, Queens, part of Westchester, and Long Island) from September 2012 to April 2014.  Relator Mullins has worked in pharmaceutical/biotech sales and patient advocacy for twenty-two years.  She has worked on three different orphan drugs for three startup companies, and she has been involved in eight new product launches and was an Advocacy Director in rare diseases.

10.     Relator Kristi Winger Szudlo ("Relator Szudlo") is an individual who resides in Powell, Ohio.  She was employed by Aegerion as an LSM for the Ohio Valley area, which includes much of Ohio, Indiana, West Virginia, and Kentucky, from December 2012 to August 2013.  Relator Szudlo has been in pharmaceutical and healthcare sales for eighteen years.  During that time, she has been involved in two startup companies and seven drug launches—two were complex biologics and three were orphan drugs.

11.     Defendant Aegerion Pharmaceuticals, Inc. ("Aegerion" or the "Company") is a Delaware corporation with a principal place of business in Cambridge, Massachusetts.  Aegerion conducts business in each and every state in the United States.

12.     Defendant Marc Beer is Aegerion's former CEO.  Beer joined the Company in August 2010 and was terminated in July 2015.  Defendant Beer is believed to reside in Boston, Massachusetts.  Beer is currently CEO of Renovia, Inc., which Beer founded, a healthcare company focusing on pelvic floor disorder.

13.     Defendant Melanie Detloff is a former sales representative for Aegerion and is believed to reside in Illinois.  Detloff worked at Aegerion from December 2012 through May 2017.

At present, Detloff lists her employment as a pelvic floor specialist and co-founder of Renovia, Inc.

14.     Defendant William Dull is the former Director of the Southeast Region sales territory and is believed to reside in Massachusetts.  Dull worked at Aegerion from October 2012 to June 2016 during which time Dull was promoted to Vice President for Global Marketing.  Dull is currently the Chief Commercial Officer of Renovia, Inc.

15.     Defendant Greg Fenner is Aegerion's former National Sales Director and resides in Ashburn, Virginia.  Fenner worked at Aegerion from July 2012 to March 2017.

16.     Defendant Mark Fitzpatrick was Aegerion's former Chief Financial Officer ("CFO") and is believed to reside in Massachusetts.  Fitzpatrick worked at Aegerion from May 2011 through June 2015.  He is currently CFO at Chiasma, Inc.

17.     Defendant Craig Fraser is Aegerion's former President in charge of U.S. Commercial and Global Manufacturing and Supply Chain and Chief Operating Officer ("COO").  Fraser resides in Jamison, Pennsylvania and worked at Aegerion from October 2011 to August 2015.

18.     Defendant James "Jim" Frigge is a former sales representative for Aegerion and is believed to reside in Ohio. Frigge worked at Aegerion from March 2012 through January 2017.  At present Frigge lists himself as a pelvic floor specialist and co-founder of Renovia, Inc.

19.     Defendant Daniel Rader, M.D. is the Director of the Preventative Cardiovascular Medicine and Lipid Clinic, and Associate Director of the Institute of Translational Medicine and Therapeutics at the University of Pennsylvania.  Dr. Rader was involved with Aegerion in its early years and served on its Scientific Advisory Board from 2007 through 2016.  Dr. Rader resides in

Philadelphia, Pennsylvania.  At all relevant times Dr. Rader was employed by The Trustees of the University of Pennsylvania.

20.     Defendant David Scheer is President of Scheer & Company, Inc., a venture capital firm.  Defendant Scheer also served on Aegerion's Board of Directors from 2004 through 2016. Scheer resides in Branford, Connecticut.

21.     Defendant Mark Sumeray, M.D. is Aegerion's former Chief Medical Officer. Dr. Sumeray worked at Aegerion from August 2011 through February 2016.  Dr. Sumeray currently resides in Dublin, Ireland.

22.     Defendant The Trustees of the University of Pennsylvania is the corporate form of the University of Pennsylvania, a private university located in Philadelphia, Pennsylvania. Defendant UPenn is vicariously liable for the acts of its employee, Dr. Rader, who at all times relevant to this complaint was employed by, and acted with actual or apparent authority, for UPenn.

### III. JURISDICTION AND VENUE

23.     Pursuant to 28 U.S.C. § 1331, this Court has original jurisdiction over the subject matter of this civil action because it arises under the laws of the United States, in particular the False Claims Act, 31 U.S.C. § 3729, *et seq.* ("FCA").  This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.  In addition, the FCA specifically confers jurisdiction over the state law claims asserted herein because they arise from the same transactions or occurrences of the federal claims pursuant to 31 U.S.C. § 3732(b).

24.     This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because the FCA authorizes nationwide service of process and Defendants have sufficient minimum contacts with the United States of America.

25.     Venue is proper in this Court pursuant to 31 U.S.C. § 3732(a) because one or more Defendants reside in and/or transact business in this judicial district.   At all relevant times, Aegerion's principal place of business was within this district.

26.     The Relators are unaware of any public disclosure of the information or allegations that are the basis of the original Complaint, the First Amended Complaint, or this Second Amended Complaint.   In the event that there has been a public disclosure, the Relators are the original source of the information and allegations contained in the original Complaint, the First Amended Complaint, and the Second Amended Complaint.   Prior to the filing of this action, the Relators voluntarily provided information to the United States government and the Plaintiff States regarding the false claims that are the subject of this action.   The Relators sent notice to the United States and the Plaintiff States of the false claims alleged in the original Complaint on or about July 23, 2013.   The Relators sent further notice to the United States government and the Plaintiff States of additional false claims alleged in the First Amended Complaint on or about March 13, 2014.   The Relators sent further notice to the United States government and the Plaintiff States of additional false claims alleged in this Second Amended Complaint on or about July 27, 2017.

## IV. **HOMOZYGOUS FAMILIAL HYPERCHOLESTEROLEMIA ("HoFH")**

27.     Lipids are a variety of naturally occurring fats, waxes, sterols (steroid alcohol), fat-soluble vitamins, tri-, di-, monoglycerides, and phospholipids.   Lipids serve important biological functions, including energy storage, signaling, and acting as structural components of cell membranes.   Within the class of lipids is cholesterol, a sterol considered to be an essential structural component of animal cell membranes and required to establish proper membrane permeability and fluidity.

28.     More than 50% of American adults—more than 100 million people—have some form of lipid imperfection.  More than 50 million of these people, or 27% of all adults, have elevated low-density lipoprotein ("LDL" cholesterol, or "LDL-C"), otherwise known as "bad cholesterol."  Almost 23% of adults, or nearly 50 million people, have insufficient high-density lipoprotein ("HDL" cholesterol, or "HDL-C"), also known as "good cholesterol."  More than 40 million American adults suffer from mixed dyslipidemia, which involves the combination of high LDL-C and low HDL-C.

29.     In 2010 alone, Americans spent $19 billion on drugs to treat cholesterol problems. This included $7.2 billion spent on Lipitor, as well another $3.8 billion spent on Crestor.

30.     HoFH is a rare, life-threatening genetic lipid disorder inherited from *both* parents that is usually caused by mutations in the LDC receptor.  HoFH results in a limited or complete inability to remove LDL-C from the blood.  Untreated HoFH patients have extremely high LDL-C levels, typically between 500 mg/dL and 1,000 mg/dL.  Patients with HoFH develop atherosclerosis, or narrowing and blockage of the arteries, as early as their first decade of life. HoFH patients are at extremely high risk of cardiovascular problems and many are at risk for a serious cardiac event starting in their 20s.  If untreated, life expectancy is 33 years.

31.     As Defendant Dr. Rader acknowledged during an October 17, 2012 meeting with the FDA:  "Amazingly, even with current existing therapies, including all the drugs we have available to us in LDL apheresis, a recent report reported that the mean age of death in [HoFH] is 33 years old."  Dr. Rader went on to explain:  "In normal individuals with normal LDL cholesterol levels they approach this threshold for cardiovascular disease in the range of 60 to 80 years old. In homozygous FH patients because of the marked LDL cholesterol, they approach this threshold much sooner, prior to age 20."

32.     HoFH is so rare that the FDA estimates only 1 in 1 million people in the United States have the disorder.  The estimate is shared in the scientific community and, as detailed below, has been cited repeatedly by Aegerion and Defendants, including Defendant Dr. Rader.  As the U.S. population is just over 300 million, it is estimated that there are approximately 300 people in the country with HoFH.

33.     Historically, HoFH has been difficult to treat because traditional "high cholesterol" treatments are ineffective. Statins are the pharmacological agents of choice for high cholesterol, but unfortunately, this class of drugs is not particularly effective in reducing LDL-C in the HoFH population because they act primarily by up-regulating LDL-R or receptor, which is defective or absent in these individuals.  Other non-statin lipid-lowering drugs produce reductions in LDL-C that are usually insufficient to allow HoFH patients to reach LDL-C goals.  Another alternative for those with mortally high cholesterol is LDL apheresis, which is akin to kidney dialysis.  According to Defendant Dr. Rader, LDL apheresis is the "physical purging of the blood to remove LDL cholesterol.  Patients have the 3-4 hour procedure involving two intravenous lines every one to two weeks.  This procedure is very taxing on patients and treats the symptoms of the disease as opposed to the disease mechanism itself, and it is also costly.  While apparently beneficial, the apheresis treatment merely delays the progress of the disease."  Lastly, another severe treatment is liver transplantation, which Defendant Dr. Rader has dubbed a "last resort" because it "requires lengthy time on a transplant list and involves life-threatening complications and lifelong immunosuppressive therapy."

34.     Consequently, there is an unmet medical need for treating this life-threatening, rare disease.

35.    HoFH should not be confused with HeFH (heterozygous familial hypercholesterolemia).   HeFH is a more common genetic disorder in which the patient has inherited the genetic defect from one parent (hence the designation, "hetero") and *not* both parents. The prevalence of HeFH is accepted to be around 1:500, far more widespread than HoFH.   The typical range of LDL in HeFH patients is approximately 200 mg/dL to 400 mg/dL.   Juxtapid, the drug in question here, was approved only to treat HoFH and not the more frequently diagnosed HeFH.

## V. FACTUAL ALLEGATIONS

### A.    Lomitapide, Juxtapid, Aegerion and the Road to FDA Approval

36.    In 1996, Bristol-Myers Squibb Company ("BMS") submitted an Investigational New Drug Application ("IND") to the FDA with a view to developing the drug known as BMS-201038 (now known as Lomitapide) for mixed dyslipidemia.   At the time, the drug was thought to be potentially very valuable, because an estimated 40 million people in the U.S. have mixed dyslipidemia (meaning a combination of high "bad" cholesterol and low "good" cholesterol).   Two BMS scientists involved in this project were Dr. Richard Gregg ("Dr. Gregg") and Dr. John Wetterau ("Dr. Wetterau").

37.    Defendant Dr. Rader had a prior relationship with Dr. Gregg and Dr. Wetterau and was aware of the BMS clinical testing on Lomitapide.   Dr. Rader then became involved as a clinical trial investigator for Phase II clinical trials studying the effects of chronic dosing of BMS-201038 on gastro-intestinal side effects.   This study occurred from February to December of 1999.

38.    In 2000, BMS abandoned development of BMS-201038 as a result of safety concerns, chief of which were (i) hepatic steatosis, the accumulation of fat in the liver, which may be a risk factor for progressive liver disease, and (ii) diarrhea/vomiting.

39.     When Dr. Rader learned that BMS had abandoned development of BMS-201038, he approached BMS about the possibility of donating the drug to UPenn.

40.     After a number of discussions with BMS scientists and UPenn administrators, on August 21, 2001, the IND (IND 50820), which BMS had submitted for BMS-201038, was transferred to UPenn for use in the development of a potential treatment for severe hypercholesterolemia and HoFH.   UPenn and BMS also entered into a Technology Donation Agreement (the "Original TDA"), whereby, among other things, BMS donated to UPenn one patent claim that covered BMS-201038, granted to UPenn certain rights in and to related BMS know-how, and transferred to UPenn quantities of BMS-201038 in the form of bulk drug substance.

41.     Armed with the right to develop the drug, Dr. Rader sought to use the easiest, fastest, and cheapest route to market—the orphan drug program.   This FDA program exists to incentivize innovation where patient populations are under 200,000 in the United States.   "Orphan" drugs receive a variety of benefits not available for other drugs.   First and foremost, orphan drugs can more easily and cheaply gain FDA approval, avoiding the need to obtain the same level of rigorous evidence of safety and efficacy as non-orphan drugs.   Second, there are various financial incentives, including federal research grants, tax credits, extended marketing exclusivity, and waiver of the FDA's user fees.

42.     From June, 2003 to February, 2004, Dr. Rader, using his lab and resources at UPenn, conducted a pilot study of six subjects in the HoFH population.   Even at that time, Dr. Rader suggested broader application of the drug beyond HoFH patients, but was met with FDA resistance.   On July 20, 2004, in a teleconference following his pilot study, and in response to a proposal to expand the indication beyond HoFH, the FDA informed Dr. Rader and a number of

additional UPenn representatives "that the expanded use of the product in the additional groups of patients shifts the risk-benefit profile of the development program" in an adverse direction. The danger of bringing a potent and potentially harmful orphan drug to a market as huge as the high-cholesterol market was obvious to all.

### 1.    The Formation of Aegerion

43.    Meanwhile, with an eye towards exploiting BMS-201038 commercially, Dr. Rader connected with a former colleague, Defendant Scheer. Scheer and Dr. Rader had previously worked together and Scheer had read about Dr. Rader's Lomitapide trials when preliminary results were published in the *New England Journal of Medicine*.

44.    Defendant Scheer is a serial entrepreneur in life sciences. He started his venture capital group Scheer & Co. in 1981. Since that time, he has been a founding member and board member of ViroPharma (listed on NASDAQ), OraPharma (acquired by Johnson & Johnson) and Esperion Therapeutics, Inc. ("Esperion").

45.    Esperion was founded in 1998 by Defendant Scheer and Dr. Roger S. Newton ("Dr. Newton") as a vehicle for the commercialization of the HDL protein ETC-216. Scheer recruited Dr. Newton to run the new private company. After successfully completing a Phase II clinical trial with its synthetic HDL therapy, Esperion was acquired by Pfizer Inc. in 2003 for $1.3 billion. Scheer was the Chairman of the Esperion Board of Directors, and Dr. Rader was scientific advisor to the company. Dr. Rader observed first-hand how much money could be made from a long-shot cholesterol drug during his time with Esperion, so it is not surprising that Dr. Rader was willing to collaborate with Scheer again when the opportunity arose with a new cholesterol-fighting drug– namely, BMS-201038.

46.     In 2004, Defendant Scheer built a new team around UPenn's BMS-201038.  Even before Aegerion was incorporated, Scheer recruited Gerald Wisler, formerly vice president of marketing at Novartis, to become CEO of Aegerion in December 2004.  On June 8, 2005, Aegerion was incorporated in Delaware with corporation number 3922075 and a principal place of business at 250 West Main Street, Branford, CT 06405—the offices of Scheer's venture capital firm, Scheer & Co.

47.     According to Aegerion's first SEC filing on September 2, 2005, there were four beneficial owners of the company's stock (valued at that time at $749,000): Scheer; Scheer & Company, Inc.; Wisler; and William Lewis (CFO).

48.     Notwithstanding the fact that Aegerion had no commercial assets, Scheer's new shell company soon attracted investors.  Although there was no public evidence that Aegerion was about to win the exclusive worldwide rights to market BMS-201038, according to the Company's second filing with the SEC on January 3, 2006, the number of beneficial owners of the company stock increased to 13, with the total shares now valued at $22,520,274.  The new investors included some large off-shore investors notwithstanding the fact that the Company had no assets.

49.     On May 19, 2006, within months of the above-referenced investments, Aegerion reached an agreement with UPenn to grant Aegerion exclusive, world-wide rights to "research, develop, commercialize, make, have made, offer for sale and sell" the drug BMS-201038.  BMS-201038 was renamed AEGR-733 and became Aegerion's sole commercial asset.  The future of Aegerion and the fate of the early investors' $26.5 million now lay with this single drug.

50.     On March 21, 2007, Aegerion embarked upon an initial effort at "going public" by filing its Form S1 Registration Statement with the SEC defining the Company's mission as:

> [D]eveloping AEGR-733 [Juxtapid] as an oral once-a-day treatment for individuals with high lipid levels [… ]

> […] We also believe AEGR-733 has the potential to address the unmet medical needs in certain niche patient populations, such as the approximately 30,000 patients in the United States with severe refractory hypercholesterolemia […] Of these 30,000 patients approximately 300 patients in the United States have a rare genetic disorder called homozygous familial hypercholesterolemia, or HoFH, resulting in severely elevated levels of LDL-C […]

Thus, as a matter of record, Aegerion publicly stated the HoFH patient population was approximately 300.  But Juxtapid sat at the apex of a broad-based pyramid of cholesterol disease, and Aegerion affirmed its goal was to use Juxtapid to treat a much larger patient population.

51.     Meanwhile, Dr. Rader remained the sponsor of IND 50820 and was actively promoting Aegerion.  Dr. Rader was a member of Aegerion's Scientific Advisory Board as early as 2007.  Dr. Rader also became an Aegerion investor.  On April 25, 2006, Aegerion sold 265,041 of its own shares to Dr. Rader at one tenth of a cent each for an aggregate sale price of a mere $390.  According to an SEC filing, Aegerion valued equity awards before the end of April 2006 at $0.91 share, making Dr. Rader's stake worth $241,187.31.  However, for shares awarded from the beginning of May 2006, the Company ascribed a value of $5.27 per share.  Applying that valuation, which prevailed just five days after Dr. Rader's purchase, the value of his stake was $1,396,766.07.

52.     In return, Dr. Rader transferred IND 50820 to Aegerion.  Henceforth, it was in Dr. Rader's financial interest to see Aegerion's stock price grow.

## 2.     FDA Approval Process

53.     Aegerion gave AEGR-733 the new name of Lomitapide, commercially known as Juxtapid, and continued on the path to FDA approval.

54.     Dr. Rader proceeded with a Phase III clinical trial of Juxtapid and proposed to the FDA that the trial be expanded to the patient population with "severe refractory hypercholesterolemia" (patients with high cholesterol who did not respond to other treatments).

The FDA insisted that this change would require an expansion of the trial beyond the 36 subjects being proposed. Dr. Rader and Aegerion balked—choosing to remain with the small HoFH population.

55.     In an interview with Medscape's *Heartwire* magazine, published on January 10, 2007, Dr. Rader—who disclosed "having a small equity interest in Aegerion"—defended the risk/benefit analysis for HoFH patients: "If you're going to die of heart disease in 10 years, you're not too worried about the risk of chronic liver disease in 20 or 30 years." But Dr. Rader also revealed an agenda to sell the drug into the off-label market, admitting that he also thought Juxtapid could be used for patients who did not have HoFH: "I'm pretty confident that this drug does have a niche, but that niche could be as small as homozygous familial hypercholesterolemia—basically 300 patients in the US—or it could be as large as the several million patients who are statin-intolerant or who don't achieve LDL goals on statins plus [ezetimibe] therapy … It's probably going to be somewhere in between."

56.     In October 2007, the FDA formally granted Juxtapid an orphan drug designation for the treatment of HoFH.

57.     On November 9, 2009, the FDA had a face-to-face meeting with Aegerion executives to discuss Aegerion's interest in the larger HeFH population. Topics of discussion included: "uncertainty regarding the long-term consequences of Lomitapide-associated hepatic steatosis." At this meeting, the FDA told Company executives that a trial could be initiated in the refractory HeFH population, but this would need to be accompanied by a second trial in high-risk HeFH patients as well, and possibly an additional outcomes trial. Aegerion chose not to pursue a broader label indication and did not conduct the trials proposed by the FDA.

58.     On May 17, 2010, Aegerion executives held an "End of Phase II" meeting with the FDA, where the FDA expressed concern about potential "off-label use" of Juxtapid.  Aegerion agreed to implement post-approval supply constraints to protect against this risk.  Aegerion informed the FDA that it would pursue only the more limited HoFH indication due to "financial constraints."

59.     Aegerion recruited a new CEO, Beer, who was installed on September 13, 2010. Very shortly after Beer was appointed, Aegerion's Chief Medical Officer William Sasiela suddenly resigned from his position on September 30, 2010.  Aegerion announced the departure in an SEC filing on October 7, 2010, and also reported that it had no immediate candidate to replace Sasiela.

60.     Then, in late 2010, Aegerion made a major pivot and adopted a new estimate of the patient population for HoFH.  The Company now proposed that the number of adult patients with HoFH in the United States was 3,000—ten times more than the Company's prior estimate of 300 made to the FDA.  This new 3,000 number would henceforth often be repeated, but never explained.

61.     Aegerion unveiled this new and expanded estimate of the U.S. HoFH population at the "5th Annual Canaccord Genuity Cardiovascular, Diabetes & Obesity Conference" on November 23, 2010 (the "Canaccord Conference").  Dr. Rader lent his name—and prominently displayed his UPenn affiliation—to an Aegerion slide presentation that made this extraordinary claim.   At the time of the presentation, Aegerion had no Chief Medical Officer, so this endorsement by Dr. Rader, who was listed as both a Professor of Medicine and Pharmacology at UPenn and Director of UPenn's Preventative Cardiovascular Medicine and Lipid Clinic, was especially important.   A patient population of 3,000 in the U.S. is a tenfold distortion and

exaggeration of the true HoFH population and contrary to Dr. Rader's prior public assertions.  This would not be the last time that Dr. Rader attempted to recalibrate the patient population to benefit Aegerion and UPenn.

62.     In a face-to-face "pre-NDA [New Drug Application]" meeting with the FDA on June 15, 2011, Dr. Rader tried to introduce a new element to the HoFH population—those with "functional" HoFH.  In response, the FDA commented:  "Please note that the functional HoFH definition of patients with average fasting LDL >300 mg/dl on maximally tolerated lowering therapy closely resembles the severe refractory heterozygous FH population and expands the target population almost 10-fold."  But expanding the target population tenfold was precisely what Dr. Rader, Scheer, Beer and other Defendants intended.

63.     At each step of the way, Dr. Rader was instrumental in the FDA approval process.  Beer noted on an investor call in early 2011: "Dan Rader puts a significant amount of time into our company and into our filing plans and into our prep for the panel."  In another investor call, during the Third Quarter of 2012, Rader (along with Aegerion's medical affairs team) were commended by CEO Beer for their efforts to achieve publication of their Lomitapide Phase III trial findings in the *Lancet*.  Moreover, Rader's position as a prominent doctor at UPenn was the subject of glowing press stories that greatly assisted in Juxtapid's marketing campaign.

64.     As described in detail below, Dr. Rader helped promote Juxtapid and Aegerion by appearing at medical conferences and Aegerion's executives continued to cite to Dr. Rader as an expert in the field.

65.     On July 22, 2011, Aegerion recruited Dr. Sumeray to fill the vacant position of Chief Medical Officer, which had been vacant since September 30, 2010.

66.     In February 2012, Aegerion submitted a New Drug Application ("NDA") for Juxtapid limited solely to HoFH, even though the Company executives did not intend to limit the drug to the small patient population of HoFH.

67.     Meanwhile, Aegerion sales representatives were profiling potential patients in anticipation of FDA approval.  Some sales representatives were spreading a wide net to encompass patients beyond HoFH sufferers.  Defendant Frigge used the following letter to introduce himself, Aegerion, Defendant UPenn and Defendant Rader to potential prescribers:

---

Jim Frigge

Lipid Speciality Manager
National Lipid Association Member
Aegerion Pharmaceuticals
Jfrigge@aegerion.com
[REDACTED]

Dr. Doctor,

Hello. I represent Aegerion Pharmaceuticals and we have a drug in final review with the FDA for patients with a form of Familial Hypercholesterolemia.

We are working with Dr. Dan Rader, M.D. at the University of Pennsylvania to identify the appropriate patient population. My goal is to speak to thought leaders so we can learn how best to serve this unmet medical need.

I would welcome the opportunity to get to know more about you, your practice and research as well as tell you about what we are doing and recent progress.

Can we set up a couple minutes to discuss this topic?  I am based in Cleveland but more than willing to work around your schedule. I prefer to meet in person but if it's easier for your schedule to have a **phone conversation** or **Skype** just let me know. Again, I want to accommodate your schedule.

I appreciate your consideration.

All the Best,


Jim Frigge

---

68.     It is noteworthy that Defendant Frigge advertised the drug as treating "Familial Hypercholesterolemia" rather than Homozygous Familial Hypercholesterolemia, the former condition being far more prevalent than the latter.  Ultimately Defendant Frigge's tactics worked.  According to an email of June 29, 2012, Frigge was the leading sales representative in the search for potential patients and prescribers with 119 potential patients identified.

69.     Relator Clarke made handwritten notes of a conversation with Defendant Fraser from October 2012, prior to FDA approval, which in retrospect, show that the target patient population was always intended to be "severe refractory LDL 200-300 on MTT [maximum tolerated therapy] with documented coronary heart disease" (as opposed to HoFH).  Fraser further stated that, with these parameters "*3750 is our target @ label and off-label.*"

70.     Later that same month of October 2012, the FDA convened an Advisory Committee Meeting to discuss whether the FDA should approve Juxtapid.  At that meeting, Dr. Rader—who was the first presenter on behalf of Aegerion and touted his UPenn position on his PowerPoint slides—unequivocally endorsed the accepted wisdom on the size of the U.S. HoFH population (*i.e.*, 300), and he reaffirmed this initial figure:  "The estimated prevalence of homozygous FH is approximately 1 in a million people."  Responding to the committee's concerns about off-label marketing beyond HoFH, Dr. Rader stated:  "We have no intention of promoting the drug outside of that very narrow, very small patient population, and we will discourage its use outside of that patient population."  However, as noted, Dr. Rader already had gone public two years earlier with Aegerion's new "3,000" patient population number as groundwork for the off-label marketing to come.[4]

---

[4] In a subsequent interview with the Daily Pennsylvanian (UPenn's student newspaper), Dr. Rader stated that he believed the prevalence of HoFH to be 1 in 400,000.

71.     Despite recommending approval by a vote of 13-2, the FDA panelists strongly urged the FDA to restrict use of Juxtapid to patients with HoFH and to "avoid the slippery slope" of using the drug in patients with severe refractory hypercholesterolemia—stubbornly high cholesterol.  The most pointed comments came from Sidney Wolfe, M.D. ("Dr. Wolfe"), Founder and Senior Adviser of Public Citizen's Health Research Group.  Dr. Wolfe stated:

> Given the enthusiastic response by Wall Street when these documents came up, and if you add up all the number of people in this country and know that only a small fraction are going to be able to afford it, it is at least likely – even if company doesn't intend that because they repeatedly said we're limiting this only to HoFH – that *glowing financial predictions ultimately depend on sales for off-label use* to treat elevated cholesterol in the larger number of patients who do not have HoFH.

> So I think that in view of that, there needs to be some sharpening up of the risk management to more explicitly make sure that *only people with HoFH* get included in the trials […]

> If it's approved, however, a serious rethinking of the risk management program to more definitively exclude the possibility, if it's proven to be too dangerous to use on patients *who do not have HoFH*, is urgently needed. *See* Transcript, Meeting of Endocrinologic and Metabolic Drugs Advisory Committee (Wed. Oct. 17, 2012)

(Emphasis added).

72.     On December 21, 2012, the FDA approved Juxtapid to treat HoFH.  In a press release dated December 26, 2012, the FDA announced, "FDA approves new orphan drug for rare cholesterol disorder."  In that press release the FDA announced both the limited approval for Juxtapid, as well as the small patient population.

> On Dec. 21, the U.S. Food and Drug Administration approved Juxtapid (Lomitapide) to reduce low-density lipoprotein (LDL) cholesterol, total cholesterol, apolipoprotein B, and non-high-density lipoprotein (non-HDL) cholesterol in patients with homozygous familial hypercholesterolemia (HoFH). Juxtapid is intended for use in combination with a low fat diet and other lipid-lowering treatments.

> HoFH is a rare inherited condition that makes the body unable to remove LDL cholesterol, often called the "bad" cholesterol, from the blood, causing abnormally

- 20 -

high levels of circulating LDL cholesterol. In the United States, HoFH occurs in *approximately one in one million individuals*. For those with HoFH, heart attacks and death often occur before age 30.

(Emphasis added).

73.    The Original Label for Juxtapid expressly limited its "Indications and Usage": "JUXTAPID is a microsomal triglyceride transfer protein inhibitor indicated as an adjunct to a low-fat diet and other lipid-lowering treatments, including LDL apheresis where available, to reduce low-density lipoprotein cholesterol (LDL-C), total cholesterol (TC), apolipoprotein B (apo B), and non-high-density lipoprotein cholesterol (non-HDL-C) *in patients with homozygous familial hypercholesterolemia (HoFH)*." (Emphasis added).   Moreover, the label detailed two "Limitations of Use," including: "The safety and effectiveness of JUXTAPID have not been established in patients with hypercholesterolemia who do not have HoFH."

**B.    Post Approval, Juxtapid is Marketed Off-Label**

74.    At the time of approval, Juxtapid was Aegerion's first and only product.[5]  Thus, Aegerion's fate, and the financial interests of its investors, were entirely dependent on that one drug.  Aegerion imposed a hefty (and lucrative) price tag—$235,000—for a year's therapy on Juxtapid.

75.    When Relator Clarke first interviewed with Aegerion on March 26, 2012, she met Paul Merrigan ("Merrigan"), the Director of Global Marketing.   In that interview, Merrigan mentioned that Aegerion was counting on at least 40% of Juxtapid sales in the off-label market. To illustrate his point, he drew a large circle (which Relator Clarke copied), which he designated "HE" (heterozygous hypercholesterolemia).   Next to it, but overlapping with the big circle, he drew a small circle designated "HoFH," to illuminate that the narrow HoFH label indication gave

---

[5] It remained that way until late 2014, when Aegerion acquired the drug Myalept.

the Company an entrée into the mainstream high cholesterol market.  At the time Relator Clarke thought the off-label projections were an assumption that some prescriptions would inevitably be written off-label, but later came to realize this was a Company-wide marketing strategy.  This strategy was very quickly rolled out in a training module for Aegerion's LSM sales force.



76.    All three Relators attended the Juxtapid Launch Meeting in Cabo San Lucas, Mexico between January 14 and 18, 2013—an unusually glamorous location for the launch of an orphan drug with a total target population of approximately 300 patients.  There, Defendant Fraser made a presentation on "The Art of Not Defining HoFH."   During that presentation, and throughout the entire sales meeting, the sales reps were repeatedly told that there was no definition of HoFH, instead the doctors should decide for themselves what constitutes HoFH by patient observation (but not genetic testing).  During this meeting, Aegerion's senior executives told the sales team that the disease was not as rare as 1 in 1 million.  Instead, one presenter stated that Dr. Rader estimated the prevalence to be 1 in 265 – a figure dramatically below Dr. Rader's prior statements to the FDA.  This would not be the first time the Company would use Dr. Rader to encourage off-label marketing and sales.  According to Relators, given Rader's role at Aegerion, his theories and philosophies regarding the purported under-diagnosis of HoFH—ideas that were

contrary to his public statements during the FDA approval process—were constantly instilled to Aegerion's sale staff by Company executives. The pitch would continue with the observation that one patient in the Company's FDA approved study had LDLs as low as 152. Fraser indicated that it was an easy sell to pose the rhetorical question: "Doctor, do you have a patient with LDLs of 152 who is not improving despite taking a statin?" Fraser also spoke to small breakout groups and, when huddled together, Fraser would suggest a pitch of the following nature: "Doctor, I'd like to talk to you about your severe refractory lipid patients because that's exactly what we studied in an HoFH study." When Relator Szudlo asked about the label restriction that the patient's parents should also both have to have hypercholesterolemia, Fraser's reply was that "sometimes not everything will line up!"

77. Scheer also attended the Juxtapid launch party in Cabo San Lucas. There, he would have heard Fraser make the presentation on "The Art of Not Defining HoFH" and witnessed the hype surrounding this tiny drug. CEO Beer escorted Scheer around the party, introducing him to the sales reps. Scheer and Beer both knew that "glowing financial predictions ultimately depend on sales for off-label use," as Dr. Wolfe previously had warned at the FDA approval meeting for Juxtapid.

78. The tactic to avoid any association between Juxtapid and HoFH became Aegerion's marketing strategy, and it was reinforced in emails, conversations, and slide presentations. For example, in the "Executive Business Review" slide presentation of May 16, 2013, LSMs were cautioned in these terms: "Do not lead with HOFH; stop presentation after results (50% reduction in LDL-C) and probe for patients." In the "What's Working" section of the presentation, the Western Region found "Not defining HOFH" to be helpful. The Eastern Region concurred,

observing in a discussion of "What's Not [Working]" that "Opening calls with HOFH" was a mistake.

79.     The tactic of avoiding any mention of the true and very limited FDA-approved use of Juxtapid dovetailed nicely with Aegerion's express strategy of discouraging genetic testing. Indeed, in the Western Region Review referenced above, Aegerion expressly identified "Academic 'purist' + genetic testing" as being a "threat" to Juxtapid sales.  Aegerion was concerned that genetic testing would confirm that patients did **not** have HoFH, and therefore were **not** suitable patients for Juxtapid.

80.     Aegerion's National Sales Meeting was held in Las Vegas between April 29, 2013 and May 2, 2013.   Again, the meeting served as a platform for Aegerion's off-label strategy. Defendant Detloff, LSM for New Orleans, presented "best practices" to the assembly of LSMs while Defendants Fenner, Dull, Fraser and various other Aegerion management looked on.  Defendant Detloff talked to the group about going to patients' homes to get them to sign the consent forms, indicating quite clearly that she already had the patient's names and/or addresses. Defendant Detloff also talked about the fact that HoFH is genetic and getting other family members that she thought had HoFH at the home to sign consents and/or discuss seeing the doctor.  Aegerion even used some of Detloff's SMN's (statements of medical necessity) on the screen as an example how they should be filled out.  It became apparent from the handwriting that Detloff had filled them out herself.  This would require her to have knowledge of privileged patient information.

81.     Shortly after the Aegerion National Sales meeting, from May 30 through June 2, 2013, the National Lipid Association held its own convention in Las Vegas.  Aegerion sent a contingent to this conference, including Dr. Rader, Marc Beer, and Greg Fenner.  Based on conversations with doctors that attended the conference, Relators understand that these Defendants

continued to present HoFH as far more prevalent than the accepted medical literature supports and urged against genetic testing as a means of diagnosing HoFH.

82.     Defendant Detloff's goal-oriented sales tactics put her among the highest performing sales representatives at the Company.  Internal documents show that by June 7, 2013, Detloff was credited with 19 Juxtapid prescriptions second only to Defendant Frigge with 29.  With three weeks to go until the end of that quarter both Detloff and Frigge had far exceeded their sales targets of eight prescriptions.

83.     At the same meeting, Defendant Fenner spoke on the subject of "not 'defining' HOFH patients – opening up minds" in his "Lessons Learned" presentation.  The slide also illustrates the Company's focus on "EMR [electronic medical records] patient mining."  Relator Mullins took a photograph of the slide with her cell phone:



84.     Indeed, Defendants continued to hammer home to marketers the need to deviate from the accepted prevalence of HoFH in the population when marketing Juxtapid.  Among other things, according to Relator Szudlo's contemporaneous notes, the assembled employees were told that the "1 in a million" figure for HoFH "was in 1973" – suggesting that the figure was outdated and too small, despite Aegerion's clear adoption of that number before the FDA when it was arguing for approval of its orphan drug.  Employees were also told that HoFH is "[n]ot a textbook disease—not 1 in million."  The same assembly was told to "intsill[…] the fear" of HoFH and then "provid[e] the solution"—which obviously meant prescribing Juxtapid.  The message, yet again, was unmistakable: marketers were to aggressively promote Juxtapid to a far broader population than permitted by the FDA.

85.     Under cover of this deliberate confusion as to the definition of HoFH, Defendants Beer, Fenner, and Fraser encouraged sales representatives to "data mine" for candidates for therapy with Juxtapid by ignoring the FDA-approved indication, and instead using some version of the proposed indication that the FDA consistently has rejected.  The hunt for such patients ranged from a personal review of patient files to electronic data mining on a grand scale.

86.     Data mining consists of searching for patients using the "functional" definition of HoFH, *e.g.*, high LDL-C values, which the FDA has disallowed.  Of course, HoFH is so rare and deadly, a doctor would not need to "data mine" for patients—like a 1926 Buffalo Nickel, you know when you have one.  Indeed, Beer publicly stated on October 18, 2012, that most HoFH patients are diagnosed between 2 and 5 years of age, and thus these patients already have been identified; no data mining is necessary to find them.  The pictures that Aegerion has used to portray the seriousness of the disease also convey how conspicuous the condition is.  In this picture, an HoFH patient's fingers are swollen with cholesterol deposits:



87.     Defendants therefore encouraged sales reps and doctors to search for patients who do not have the HoFH genotype, and are more likely simply patients with stubbornly high cholesterol.

88.     On May 17, 2013, Bart Sladovnik ("Sladovnik"), the LSM for the Omaha area, performed data mining of the "entire patient database" for Heart Consultants, a large cardiology practice in Omaha.  "Dr. H" of Heart Consultants provided Sladovnik with a laptop and a conference room, and the two of them ran queries, first looking for patients with LDL-C greater than 250, and then looking for patients with LDL-C greater than 160.  Then, Dr. H left Sladovnik alone to review electronic charts to determine whether there were clinical findings "consistent" with HoFH.  This process yielded eight patients, none of whom had a clinical diagnosis or genetic test indicating HoFH.  Dr. H then agreed to consider these patients for Juxtapid therapy, and even agreed to schedule several of them in one day—to be called a "Juxtapid consult day," where Sladovnik could meet the patients and try to convince them to agree to the therapy.

89.     This unlawful data mining was not simply tolerated by Aegerion, it was positively encouraged.  Sladovnik's success that day was trumpeted in Company emails to the sales reps,

evoking high praise from Defendant Fraser: "Great story and opportunity!  Team, thanks for all your great work identifying patients in nearly every practice we visit." Defendant Dull also lionized Sladovnik to the sales force, "*Team, a great example of a LSM focusing on a cardiology practice to mine a database of **potential HoFH and Juxtapid patients**. I want to see all of you targeting large CD practices to perform EMR searches to identify appropriate patients. Nice job Bart! Look forward to the results! bill*." (Emphasis added).  Apart from the egregious violation of patient privacy, Dull's distinction between "HoFH and Juxtapid patients" would not have been lost on the sales force: there are patients with HoFH and then there are "Juxtapid patients."

90.    Despite the repeated claims that the target population of HoFH patients was 1 in 1,000,000, Defendants continued to make public statements that the HoFH population was ten times larger in order to cover up off-label marketing.  Without inflated estimates of the patient population, an alert observer would realize that the Company would very soon saturate the tiny U.S. market and have no room for growth.

91.    On January 23, 2013, CEO Beer appeared on CNBC's *Fast Money* (http://video.cnbc.com/gallery/?video=3000142358) where he made the following claim:

> You know with all the rare diseases, we don't know exactly how many patients are out there until we have an effective therapy that comes to the market.  We have studied it carefully in the last two years and we think there's about 3,000 patients in the U.S. and 3,000 in Europe.

In the same interview, Beer remarked:  "If you're on an effective diet, this drug brings down your cholesterol rapidly, effectively and safely," without any qualification that might be appropriate for a drug with a checkered safety history and which carries a black box warning.

92.    Aegerion LSMs came under such intense pressure to sell Juxtapid that all three Relators—each with decades of drug sales experience—had never known anything like it.  For

example, Beer became an Aegerion sales rep for a day to show the sales force how it should be done.

93.     On February 27, 2013, Defendants Beer, Fenner, and Fraser set out on a "hunting" competition.  The aim of the hunt was to sell prescriptions for Juxtapid and, by real time email updates, teach the sales force to be equally aggressive.   An email entitled "Game On" was circulated at 9:10 a.m. announcing:  "clock has just started ticking."   Five minutes later, the first prescription (possibly two) was claimed by Beer who boasted that, before his flight had even landed that morning, he had a customer:   "*Sitting next to an Atlanta CV physician on the plane..."script number one" achieved...possibly two...fill you in when I land Natalia!! Clarke and Frigge...whattaya got!!:)*"  This braggadocio simultaneously was broadcast to the LSMs involved, as well as Beer's administrative assistant, Mary Landers, and the Commercial team's administrative assistant, Ally Leonard; and it continued throughout the day among the three men. By 10:31 a.m., Fraser claimed two prescriptions and added:

> Sorry.... Jim and I have been too busy selling.  We just had mccoullgh [*sic*] (head of cardio) agree to not only treatments for two patients, [*sic*] But have his research nurse do an EMR run for ascension healthcare's 1,400 facilities (and 20% of Michigan's lives) to work on a mail / education campaign.

At 12:42 p.m., Jim Frigge claimed another prescription.  Fenner claimed another two by 3:26 p.m. The day ended with the aggregate writing of six or seven prescriptions for Juxtapid, and Beer celebrated by circulating the following picture of patient sensitive data scattered at his feet:



94.     There are approximately 23,000 cardiologists in the United States.  Assuming a total HoFH population (including children) in the country of 300 (1 per million), one would expect on average to screen about 77 cardiologists to locate a single HoFH patient.  Therefore, it is highly unlikely that Beer was lucky enough to be seated on an airplane next to a cardiologist with a true HoFH patient, and far more likely that the Aegerion CEO pitched the drug to the doctor off-label.  Furthermore, even assuming, *arguendo*, that the email from Beer was misleading and he did not truly achieve any genuine sales of Juxtapid, the message to the sales force still would be (and was) clear: *Regulations be damned!  Sell this drug!*  As Greg Fenner stated in an email on May 8, 2013, announcing a bonus incentive program:  "LSMs, not to be outdone, Frigge kicked in 1 new RX yesterday and he has two patient onboardings today.  Don't let these chickens get away, the grease is hot, fry 'em up!!!"  Even so, the Company needed targets.

95.     This hunting metaphor was used repeatedly as sale representatives were pressured by executives to track down more guinea pigs for Juxtapid.  For example, on April 22, 2013, Fraser and Fenner both forwarded an email to sales representatives entitled "the Hunt" in which they

praised Coy Pitts for taking the hunt to "another level" including a photograph of Pitts dressed to kill:



96.     In early May, 2013, Fenner lead a conference call with the sales force and instructed them to line up a leading physician to speak on HoFH.  However, Fenner cautioned the sales reps that they must chose speakers "who believe in *our definition* of HoFH."  (emphasis added).

97.     Relator Szudlo found that when she visited doctors' offices and explained that Juxtapid was a newly-approved drug for HoFH, the doctors would politely hand her card back and end the meeting explaining that they did not have any patients with HoFH.  Some doctors remarked that they had never seen a patient with HoFH.

98.     When Szudlo shared her experience with Fenner, he told her:  "You do not mention HoFH."  Fenner explained that the term HoFH was the ultimate *faux pas*, echoing the prior instructions about "not defining" HoFH.  Instead, he instructed Relator Szudlo that she should talk in terms of generalities about a "breakthrough" lipid treatment for refractory patients with high

cholesterol.  When the doctor showed interest, he instructed, she should then invite them to lunch where they could discuss the matter further and see what patients might be helped with this new wonder drug.  However, as Relator Szudlo soon learned, if after one of these initial meetings, a doctor identified a likely candidate but changed his mind, Defendants would pressure both the LSM and the doctor into a different course of action.

99.     Relator Szudlo met "Dr. M" in early January 2013.  The doctor was familiar with HoFH and Juxtapid and told relator Szudlo that he would start four patients on the new therapy. The two met on March 29, 2013 to complete the enrollment of the four patients he had identified. In the meantime, the doctor had attended an independent educational program and began to have doubts about the diagnosis of HoFH and the risks attendant with Juxtapid.  After a full review of the patients' charts, Dr. M decided that these patients were not in fact HoFH patients.  When Relator Szudlo related this back to management at Aegerion, Fenner would not accept losing these potentially lucrative patients.  Instead, others at the Company called the doctor repeatedly to get him to change his mind.  Fenner told Relator Szudlo that the CEO already had reported those four prescriptions to Wall Street as revenue.  Relator Szudlo thereafter was punished for the loss of these off-label patients at each subsequent performance review.  Fraser too instructed the sales force that the definition of HoFH is debatable and suggested the way to sell Juxtapid was to speak in terms of what the drug can do, rather than what it is approved for as Relator Szudlo's notes record.  Rather than talk about HoFH patients, Fraser suggested a more elliptical approach:  "I want to talk to you about your most severe refractory patients."

I want to talk to you about your practice. Most severe refractory lipid patients

100.    Fraser suggested that sales reps should inform the doctors that there is a "lot of opportunity for you to decide who is the right patient – and the FDA agrees with that which is why they didn't define a specific LDL # required to use this mediation.  Also genetic testing is not required – not 100% accurate, you could miss a pt. and is expensive so they wanted the physician to be able to make a clinical decision."

101.    Fraser's instruction also covered the incentive compensation plan which rewarded sales representatives with $12,000 per new prescription:



102.    On June 5, 2013, Beer made another appearance on *Fast Money*.  Beer was asked directly how the Company gauges the size of the patient population for Juxtapid.  Beer replied:

> So we've studied this for about the last two years, how many patients are out there, and we've gone out there and we've talked to cardiologists and the specialty within that area, lipidologists, and we've asked them "If this product could do this to your patients, how many patients do you have that would be candidates?"  And our best estimate is about 3,000 in the US and about 15,000 in the developed countries.

Beer thus effectively admitted that rather than marketing Juxtapid for HoFH, the sales force had promoted the drug for the reduction of cholesterol in the general population and there supposedly were at least 3,000 of *those* patients (as opposed to HoFH patients).

103.    Defendant Dr. Sumeray also participated on investor conference calls where he endorsed such false statements to be broadcast to the investing world.  For example, on an investor conference call to report Aegerion's earnings for the second quarter of 2013, Beer again claimed: "There may be as many as 15,000 potential patients appropriate for Lomitapide therapy in total on a global basis, with at least 3,000 of them being in the U.S."   Rather than correcting this extraordinary **and erroneous** statement, Dr. Sumeray added:  "I believe one of the most important points that has been reinforced for launch is that there may be a more significant population of homozygous FH patients in need of therapy than we had initially anticipated."

104.    Although Beer claims that Aegerion has "studied" the numbers carefully, none of the Relators—nor anyone within the Company with whom the Relators have spoken—knows how the 3,000 U.S. patient number is derived.  Neither Beer, Aegerion nor any other defendant has ever explained the genesis of the 3,000 number.

105.    Meanwhile, Aegerion's relentless push into off-label marketing continued.  Relator Mullins was the Aegerion LSM in New York City and she called on many extremely well-informed cardiologist and lipidologist thought-leaders, the very sort of "academic purists" Aegerion fears.  Tellingly, this has made her job all the harder, because the better informed the doctor, the harder it is to persuade him that he has an HoFH patient.  On April 4, 2013, Mullins and Fenner called on "Dr. U," a noted lipidologist, with whom Mullins had regular meetings to identify patients.  Dr. U explained that he had been assiduously screening his patients for any who might be considered appropriate for Juxtapid therapy.  The doctor had identified no such candidates.  Unwilling to take "No" for an answer and knowing that the doctor had no "on-label patients," Fenner explained in an in-person meeting with Dr. U and Mullins that Dr. U needed to

start prescribing Juxtapid to gain clinical experience as soon as possible, otherwise the Company would not be able to engage the doctor as a speaker.

106.    On October 2, 2013, Beer spoke at an investor conference organized by the investment bank Leerink Swann & Co.  Beer reiterated his confidence in the inflated 3,000 patient number:

> I feel more comfortable than ever that it is 3,000 plus now that I have the clinical utility of the usage, compare that back to my market research and all the data we purchased, I feel more comfortable than ever that it is 3,000 plus patients.  I'm not comfortable taking that total market available up yet.  When we have enough data we will inform you that we think it's 4,000 or 5,000 or whatever that number points to but I think you can count on, comfortably now more than ever, that there's 3,000 plus patients out there that we believe meet the combination of our label and the REMS attestation that the physician has to write.

Contrary to Beer's assertions, there is no scientific support for such a large HoFH patient population.

107.    Another tactic Defendants have employed in order to "open up minds" is conveying the false impression that patients in the Phase III study for Juxtapid entered the study with relatively normal LDL levels.  As discussed above, during the January 2013 Juxtapid Launch Meeting in Cabo San Lucas, Defendant Fraser's "The Art of Not Defining HoFH" "pitch" included an observation that one patient in the Company's FDA approved study had LDLs as low as 152.

108.    This tactic was highly misleading and designed to obtain off-label sales.  For example, as the following slide indicates, at the start of the trial only 4 of 29 patients had LDL levels below 200.  Furthermore, of those four, three were on apheresis treatment (indicated by a star), meaning that their blood was regularly filtered to keep their LDL levels artificially low:



109. This same misleading pitch was repeated by senior management. During an October 2, 2013 Leerink Swann & Co. investor conference, Beer made the following misrepresentation:

> One of the things it's important to keep in mind is that it is not an LDL only disease, eight, eight out of, eight out of twenty three patients in our phase three trial had an LDL below 200 and, and er, were genotyped confirmed with two defective alleles, so they were genotyped confirmed patients that you know still had an LDL of between 150 and 200, so, it's important to not just look at LDLs.

110. In misstating the data, Beer gave the false impression that 8 out of 23, or 34%, of patients enrolled in the pivotal Phase III study started out with LDL levels under 200, whereas the true number is 4 out of 29, or 14%. Overlooking the fact that Beer did not mention the reason why their LDL levels were under 200 (because they were receiving apheresis treatment), Beer misled investors and physicians about the target patient population in order to convey the false impression that HoFH is not really so rare a disease after all.

C.      **Dr. Rader Lends His (and UPenn's) Name to the Promotional Scheme**

111.    Dr. Rader was not only instrumental in getting Juxtapid approved by the FDA, but Dr. Rader continued to actively promote Juxtapid/Lomitapide and Aegerion post-approval.  For example:

112.    Dr. Rader appeared in a video put out by UPenn Medicine, Perelman School of Medicine, University of Pennsylvania Health System.   In the video, which was shot after Juxtapid's approval, Dr. Rader discusses briefly the regulatory process for approval and promoting Lomitapide.   In the video, Dr. Rader appears under the title Chief, Division of Translational Medicine and Human Genetics, Perelman School of Medicine at the University of Pennsylvania and concludes by stating:  "After more than a decade of research and development, it is gratifying that Lomitapide is on the market.  And for the first time patients with homozygous FH have an effective treatment that substantially lowers their cholesterol levels.  The availability of this new medication has energized the community of physicians who care for these patients and provided new hope for these patients with this devastating disease."

113.    In November, 2013, The Daily Pennsylvanian (UPenn's student newspaper), reported on Juxtapid, "[a] new drug . . . saving lives while filling Penn's coffers."  The article notes that Dr. Rader was "the primary developer of Juxtapid at Penn" and reported that Dr. Rader estimates that "around 1 in 400,000 people in the US are affected by HoFH."  Dr. Rader is also quoted as stating, "It's a pretty rare but pretty bad disease that actually results in high cholesterol as children.  Untreated, they rarely live beyond age 23."  As Dr. Rader knows, the disease is in fact *extremely* rare—much rarer than the 1 in 400,000 figure that he provided in the article.

114.    Defendants Dr. Rader and Beer were featured in a glowing *Forbes* article about the Aegerion story, published on May 6, 2013.   The article notes that securities analysts were

forecasting Aegerion sales to exceed 760 patients by 2015 and repeated Aegerion's storyline that the patient population should be as high as 3,000.  As reported, "The FDA allows the drug to be given to any patient with an LDL over 300 who is already on other therapies. Identified this way, Aegerion thinks there may be as many as 3,000 patients."  The same paragraph concludes with a quote from Dr. Rader, "Hopefully it is going to make a big difference in the lives of these patients." Not only are the statements in the article false (the FDA approved Juxtapid to treat only HoFH, not to treat "any patient with an LDL over 300 who is already on other therapies"), but neither Defendants Dr. Rader nor Beer ever corrected or clarified these statements.

115.    In a May, 2013 internal Aegerion slide deck entitled "Executive Business Review," Dr. Rader is identified as an "Advocate" (along with three other individuals) on a slide detailing "Top Targets" and appearing to indicate that Dr. Rader had been instrumental in obtaining seven "Scripts" for Juxtapid.

116.    On April 6, 2013, the Lancet published an article written by Dr. Rader and Marina Cuchel.  Dr. Rader again promoted the benefits of Lomitapide, stressing young mortality rates. The article provides, in part:  "Development of Lomitapide for treatment of homozygous familial hypercholesterolaemia was driven by the conviction that potential cardio vascular benefits of the substantial LDL-cholesterol-lowering efficacy of the drug would outweigh the theoretical increased risk of steato-hepatitis and fibrosis in patients who rarely live past the fourth decade. With the recent approval of Lomitapide by the US Food and Drug Administration, systematic addressing of these unresolved long-term questions about hepatic safety are now imperative. The implementation of a registry will facilitate systematic and standardized long-term monitoring of patients treated with Lomitapide. In the meantime, we believe that the benefits of the LDL

cholesterol reduction achieved with Lomitapide outweigh the uncertainty about its long-term hepatic safety."

117.    Indeed, the commercial success of Juxtapid was promoted by UPenn Medicine itself, and given prominent placement in that institution's "Five Year Strategic Plan" published in the Fall of 2013.  In a section entitled "Improve Technology Transfer and Commercialization," it states:  "Advances in our understanding of biologic systems and the development of powerful new tools that can be applied at both the bench and the bedside offer unprecedented prospects for translation. Likewise, technology transfer and relationships with industry represent an increasingly important facet of the research enterprise."  The promotional material then provided the following praise for the Rader/Aegerion relationship:



Patented by Dr. Dan Rader and his team, the now FDA approved drug, Juxtapid, is licensed to Aegerion Pharmaceuticals. It will be used to treat those inflicted with a rare genetic disease called homozygous familial hypercholesterolemia (HoFH)

//

//

//

D.    **Profits and Sales Soar for Aegerion and UPenn**

118.    The aim of the off-label marketing scheme was, as Aegerion speaker Dr. Seth Baum put it at an investor conference, to convey the impression that the "data points to a potentially bigger opportunity than anyone expected."   Indeed, within one year of FDA approval, the opportunity had become embarrassingly large, with Aegerion quickly approaching 400 active patients.

119.    By June 28, 2013, internal Aegerion documents show that there were 171 patients actively taking Juxtapid.   The population estimate of 300 which Aegerion had adopted in its presentations to the FDA includes both adults and children—and thus the total adult population in the U.S. would be substantially less than 300.   Thus, the Company had somehow managed to saturate likely the entire estimated adult population in the United States.   The patient numbers themselves were beginning to betray Aegerion.

120.    On a July 30, 2013 investor call, Beer abruptly announced that:  "Consistent with our plan to discontinue offering specific launch metrics other than sales, we no longer plan to provide guidance for the number of patients on therapy at year end."   By focusing on revenue rather than patient numbers, Beer was hoping to distract observers from the obvious fact that the Company's explosive out-of-the-gate growth was driven by off-label sales.   Defendant Fitzpatrick was also on that investor call and would have known and understood the significance of Beer's change of policy.

121.    By December 2013, 374 patients were actively taking Juxtapid—that is to say that by the end of its first year on the market, Juxtapid sales already had surpassed the entire U.S. HoFH market, both adult and pediatric, despite the fact that it did not market to pediatric patients:



122.    This off-label marketing caused a tremendous growth in Juxtapid prescriptions, many of which are paid for by government programs, and a corresponding peak for Aegerion stock. On October 4, 2013, Aegerion stock closed at $97.24:



123.     Aegerion was not the only entity to profit from the off-label promotion and sale of

Juxtapid.  UPenn reaped tens of millions of dollars based on the enormous growth of Juxtapid

sales.

124.     In May 2006, Aegerion and UPenn entered into an exclusive, worldwide patent

license that provided Aegerion the right to develop and commercialize Lomitapide to treat

specified patient populations.  The license initiation fee under the UPenn-Aegerion License (the

"License") was set to be a modest payment of $56,250 to $75,000.  But, the License also provided

for quarterly royalty payments that generated significant returns for UPenn.

125.     In its 2010 Form 10-K, Aegerion detailed the relationship with UPenn as follows:

**Licenses**
**University of Pennsylvania**

In May 2006, we entered into a license agreement with The Trustees of UPenn,
pursuant to which we obtained an exclusive, worldwide license from The Trustees
of UPenn to certain know-how and a range of patent rights applicable to lomitapide.
In particular, we obtained a license to certain patents and patent applications owned
by The Trustees of UPenn relating to the dosing of MTP-Is, including lomitapide,
and certain patents and patent applications and know-how covering the composition
of matter of lomitapide that were assigned to The Trustees of UPenn by BMS for
use in the field of monotherapy or in combination with other dyslipidemic therapies
for  treatment of patients with severe hypercholesterolemia unable to come within
15% of NCEP LDL-C goal on maximal tolerated oral therapy, as determined by the
patient's prescribing physician, or with severe combined hyperlipidemia unable to
come within 15% of NCEP non-HDL-C goal on maximal tolerated oral therapy, as
determined   by   the   patient's   prescribing   physician,   or   with   severe
hypertriglyceridemia unable to reduce TG <1,000 on maximal tolerated therapy.
We also have the right to use lomitapide either as a monotherapy or with other
dyslipidemic therapies to treat patients with HoFH. We refer to the patents and
patent applications assigned by BMS to The Trustees of UPenn and licensed to us
by The Trustees of UPenn as the BMS-UPenn assigned patents.

To the extent that rights under the BMS-UPenn assigned patents were not licensed
to us under our license agreement with The Trustees of UPenn or were retained by
The Trustees of UPenn for non-commercial education and research purposes, those
rights, other than with respect to lomitapide, were licensed by The Trustees of
UPenn back to BMS on an exclusive basis pursuant to a technology donation
agreement between The Trustees of UPenn and BMS. In the technology donation

agreement, BMS agreed not to develop or commercialize any compound, including lomitapide, covered by the composition of matter patents included in the BMS-UPenn assigned patents in the field licensed to us exclusively by The Trustees of UPenn. Through our license with The Trustees of UPenn, as provided in the technology donation agreement, we have the exclusive right with respect to the BMS-UPenn assigned patents regarding their enforcement and prosecution in the field licensed exclusively to us by The Trustees of UPenn.

The license from The Trustees of UPenn covers, among other things, the development and commercialization of lomitapide alone or in combination with other active ingredients in the licensed field. The license is subject to customary non-commercial rights retained by The Trustees of UPenn for non-commercial educational and research purposes. We may grant sublicenses under the license, subject to certain limitations.

We are obligated under this license agreement to use commercially reasonable efforts to develop, commercialize, market and sell at least one product covered by the licensed patent rights, such as lomitapide. Pursuant to this license agreement, we paid The Trustees of UPenn a onetime license initiation fee of $56,250. We will be required to make development milestone payments to The Trustees of UPenn of up to an aggregate of $150,000 when a licensed product's indication is limited to HoFH or severe refractory hypercholesterolemia, and an aggregate of $2.6 million for all other indications within the licensed field. All such development milestone payments for these other indications are payable only once, no matter how many licensed products for these other indications are developed. ***In addition, we will be required to make royalty payments in a range of levels not greater than 10% on net sales of products covered by the license (subject to a variety of customary reductions)***, and share with The Trustees of UPenn specified percentages of sublicensing royalties and other consideration that we receive under any sublicenses that we may grant.

This license agreement will remain in effect on a country-by-country basis until the expiration of the last-to-expire licensed patent right in the applicable country. We have the right to terminate this license agreement for convenience upon 60 days prior written notice to The Trustees of UPenn or for The Trustees of UPenn's uncured material breach of the license agreement. The Trustees of UPenn may terminate this license agreement for our uncured material breach of the license agreement, our uncured failure to make payments to The Trustees of UPenn or if we are the subject of specified bankruptcy or liquidation events.

(Emphasis added).

126.    According to Aegerion's 2012 Form 10-K, in 2012, Aegerion paid UPenn "$50,000

upon the filing of the NDA for JUXTAPID in the U.S. and at December 31, 2012, [Aegerion]

accrued an additional $0.1 million due to UPenn for the approval of JUXTAPID in the U.S."

Aegerion also noted, "We will be required to make development milestone payments to UPenn of

up to an aggregate of approximately $2.6 million if we decide to develop JUXTAPID for

indications within the licensed field other than HoFH, and we achieve certain milestones in such

development efforts."

127.   Once Juxtapid was on the market, UPenn's royalty payments soared.   In 2013,

Aegerion paid UPenn $900,000 in royalty payments and accrued an additional $1.2 million in

royalties.   In addition, Aegerion paid UPenn $0.1 million in "development milestone payments

related to the development of lomitapide for the treatment of HoFH."

128.   In 2014, Aegerion paid UPenn royalty payments totaling $5.7 million, with an

additional $2.9 million in accrued royalties payable.

129.   By 2015, Aegerion reported that it paid to UPenn $10.2 million in royalty payments

for the year and would incur an additional $2.6 million in royalties payable.

130.   Thus, as of January 2016, UPenn received over $16.8 million in license fees and

royalty payments based on the sale of Juxtapid, and was entitled to additional payments of at least

$2.6 million.

| Year | Royalty Payment to UPenn | Royalties Payable to UPenn |
|---|---|---|
| 2012 | | $100,000 |
| 2013 | $900,000 | $1,200,000 |
| 2014 | $5,700,000 | $2,900,000 |
| 2015 | $10,200,000 | $2,600,000 |
| Total | $16,800,000 | $6,800,000 |

131.   In addition to the royalty payments, UPenn received quarterly updates from

Aegerion detailing the sales of Juxtapid.   The Patent License Agreement effective May 19, 2006

provides:

4.1 Royalty Reports. Within forty-five (45) days after the end of each Quarter following the first Sale and during the remainder of the Term, Company will deliver to Penn a report, certified by the chief financial officer of Company, detailing the calculation of all royalties, fees and other payments due to Penn for such Quarter. The report will include, at a minimum, the following information for the Quarter, each listed by product, by country of Sale and by category of royalty or sublicense fee rate, as applicable: (a) the number of units of Licensed Products constituting Sales made by Company and Affiliates on which royalties are owed Penn hereunder; (b) the gross amount invoiced, billed or received for such Sales made by Company and Affiliates; (c) Qualifying Costs corresponding to Net Sales arising from such Sales, listed by category of cost; (d) such Net Sales; (e) the gross amount of any payments received by Company from sublicensees subject to sharing with Penn under Section 3.5; (f) the amounts of any credits or reductions permitted by Section 3.7 with respect to Sales made by Company and Affiliates; (g) the royalties, fees and other payments owed to Penn, listed by category; and (h) the computations for any applicable currency conversions by Company and Affiliates. Company will use commercially reasonable efforts to obtain permission from each sublicensee to share with Penn the information listed in the foregoing clauses (other than clause (e)) as it relates to Sales made by such sublicensee, and to the extent successful, will include such sublicensee information in such royalty report. Each royalty report will be substantially in the form of the sample report attached as Exhibit D. All such royalty reports will be treated as Confidential Information of Company and will be subject to Section 5.2.

132.    The format of the Royalty Report, Exhibit D to the Patent License Agreement, provides the format for Aegerion to provide UPenn not only sales data, but also royalty forecasts for the next four quarters; reasons for any returns or significant adjustments; notes on "unusual occurrences that affect the royalty amount"; and comments on "any expected trends in sales volume." Thus, at a time when Aegerion was curtailing it public disclosures, UPenn was receiving a host of sales data and forecasts.

133.    Rather than wait for the royalties to come in, and to avoid the risk that Aegerion's oversaturation of the market would draw government scrutiny, UPenn quickly monetized its ongoing royalty agreement with Juxtapid. On June 25, 2013, UPenn announced that it had sold a ***portion*** of its royalty interest in Juxtapid for ***$55 million*** in cash. The announcement did not disclose what portion of its interest was sold, nor has the name of the counterparty been revealed.

UPenn touted this achievement, giving it prime placement in its 2012-2013 Annual Report—the Juxtapid approval and UPenn's monetization of its interest were listed among UPenn's "highlights" of Fiscal Year 2013. This promotion is no surprise. In a year when UPenn was to receive $900,000 in royalty payments, it was able to sell some portion of that stream for $55 million—a massive windfall from a drug that was so dangerous that BMS gave it away.

## E.    **Aegerion Crumbles**

134.    Aegerion's aggressive marketing and Beer's own misleading hyperbole did not go unnoticed. On November 8, 2013, the FDA sent Aegerion a warning letter. Referring to Beer's statements during *Fast Money* on June 5, 2013, and on October 31, 2013, the FDA forcefully stated:

> The statements provide evidence that Juxtapid is intended for new uses, for which it lacks approval and for which its labeling does not provide adequate directions for use, which renders Juxtapid misbranded within the meaning of the Federal Food Drug and Cosmetic Act (FD&C Act) and makes its distribution violative of the FD&C Act.

The letter also instructed the Company to correct the false impressions made by means of a "comprehensive plan of action to disseminate truthful, non-misleading, and complete corrective messages about the issues discussed."

135.    As a result of the filing of the original Complaint in this case, on January 9, 2014, Aegerion announced that it had received a subpoena from the U.S. Attorney for the District of Massachusetts relating to its sales and marketing of Juxtapid. Subsequently, in its annual report for 2013, the Company gave more detail:

> We also received a subpoena in late 2013 from the U.S. Department of Justice, represented by the U.S. Attorney's Office in Boston, Massachusetts, requesting documents and other information pertaining to our promotion, marketing, and sale of JUXTAPID in connection with a government investigation of our practices. We are in the process of responding to the subpoena, and intend to cooperate fully with the investigation. While we intend to vigorously defend ourselves, we may not be

able to resolve this matter without incurring significant fines, sanctions, or other consequences that could have a material adverse effect on our business, financial condition, or results of operations.  Even if we can resolve this matter without incurring significant penalties, responding to the subpoena has been, and is expected to continue to be, costly and time-consuming.  Moreover, this investigation could adversely impact our reputation and the willingness of physicians to prescribe lomitapide for their HoFH patients, and may divert management's attention and resources, which could have a material adverse effect on our business, financial condition, or results of operations.

136.    The game was up and shareholders ran for cover.  Following that announcement, the Company's shares began a precipitous and inexorable decline.  By May 13, 2016, the shares traded at less than $2.00 each:



137.    On July 27, 2015, the Company announced that Defendants Beer and Fraser had resigned effective immediately.

138.    Following the federal government's investigation, on May 12, 2016, it was announced that Aegerion would pay $40 million over five years to settle allegations of off-label marketing to the United States.

## VI.    FALSE CLAIMS UNDER FEDERAL GOVERNMENT HEALTHCARE PROGRAMS

### A.    Federal Reimbursement for Juxtapid

139.    The United States government—largely through Medicare—reimburses a large percentage of all drug prescriptions.  Since 2006, the Medicare program has purchased prescription drugs for those persons eligible for Medicare Part D coverage.  Medicare not only covers individuals over age 65, but it also provides medical coverage for many individuals who are permanently disabled under the Social Security Act.

140.    The United States also purchases prescription drugs through a number of other programs, including the Department of Veterans Affairs, the Department of Defense's TRICARE program, and the Federal Employees Health Benefit Plan (all these governmental health care insurance programs—including Medicare and Medicaid—will collectively be referred to as "Government Healthcare Programs").

141.    These government programs spend billions of dollars each year on prescription drugs.  Not surprisingly, in order to prevent waste, fraud, and abuse, and to protect the health of patients, the federal and state programs restrict the types and uses of drugs that may be paid for with government funds.  These regulatory schemes are designed to ensure that the federal and state programs only pay for drugs that are found to be safe and effective for their prescribed uses.

142.    The Medicare program is only authorized to purchase prescription drugs that are "covered outpatient drugs," as defined by 42 U.S.C. § 1396r-8(k)(2), and that are used for "medically accepted indications," as defined by 42 U.S.C. § 1395w-102(e)(4) (for Medicare) or 42 U.S.C. § 1396r-8(k)(6).  In order to meet the definition of a "covered outpatient drug," either an NDA or an Abbreviated New Drug Application ("ANDA") must be approved by the FDA.  In order to be used for a "medically accepted indication" under either program, the drug must be used

- 48 -

as approved by the FDA or its use must be supported by a citation in the medical compendia. Conversely, if a drug's usage is not in compliance with its FDA-approved labeling, and such usage is not favorably cited in one of the specified compendia, it is not eligible for reimbursement under Medicare.

143.     While physicians may prescribe a medication to treat conditions and diseases not expressly approved by the FDA, Part D plan coverage of drugs for off-label use is prohibited unless there is evidence that the off-label use is recognized and sanctioned by a drug compendium.

144.     The FDA approved Juxtapid for very limited uses, namely as a "microsomal triglyceride transfer protein inhibitor indicated as an adjunct to a low-fat diet and other lipid-lowering treatments, including LDL apheresis where available, to reduce low-density lipoprotein cholesterol (LDL-C), total cholesterol (TC), apolipoprotein B (apo B), and non-high-density lipoprotein cholesterol (non-HDL-C) in *patients with homozygous familial hypercholesterolemia (HoFH)*." (Emphasis added).  The label was clear:  "The safety and effectiveness of JUXTAPID have not been established in patients with hypercholesterolemia who do not have HoFH."

145.     Juxtapid's sole "medically accepted indication" is the treatment of HoFH. Drugdex, which is the most comprehensive of the three statutory compendia referenced in 42 U.S.C. § 1396r-8(g)(1)(B)(i), contains no support for any off-label indication.  Furthermore, there is no support for any other off-label indication in peer-reviewed medical literature.

**B.      Aegerion Sells Off-Label to Non-HoFH Medicare Patients**

146.     Defendants' aggressive off-label marketing caused the sale of Juxtapid to hundreds of patients who were not diagnosed with HoFH.  Thus, Defendants were promoting the drug for uses that were neither approved by the FDA nor supported by medical compendia.  This off-label promotion and sale caused patients, pharmacies and others (including Aegerion sales

representatives, like Defendant Detloff) to claim Medicare payments for Juxtapid used in unauthorized and/or unacceptable ways.

### 1.  Government Healthcare Program Sales

147.    A material amount of Aegerion's revenue came from Medicare, Medicaid and other Government Healthcare Program reimbursements.  While Aegerion never disclosed the percentage publicly, Government Healthcare Programs reimburse at least 24% of the prescriptions for Juxtapid, and likely much more.

148.    Aegerion did not disclose the amount paid by Government Healthcare Programs, such as Medicare, despite inquiries from securities analysts.  Defendant Beer acknowledged that while the Company tracked such information, it would not make it publicly available.  Specifically, during an April 30, 2013 analyst call, Eun K. Yaug from Jefferies & Company, Inc, inquired: "[O]n 75 patients on the drug now, can you tell us what percent of those patients now on private insurance versus the public?"  Defendant Beer responded:

> We haven't made that number public, Eun. It may be something we consider making public going forward. I don't know the number off of my head, just so you know. ***We track that in our dashboards very carefully, but we haven't made that public to date***. We could consider that if it seems to be material. I don't get a lot of questions off of that just because the prior authorizations are going through for both private-paid, as well as Medicaid and Medicare. I don't see an issue on either side of the fence. So we will consider that going forward, but we haven't made that public to date.

(Emphasis added).

149.    At Aegerion's National Sales Meeting in Baltimore in the fall of 2013, Paul Schneider, the new VP of Patient and Market Access, announced to a gathering of virtually the entire Company that Aegerion had ***over 90 Medicare patients*** on Juxtapid.  According to an LSM who spoke with Relator Clarke, this information was welcome news when announced to a gathering of sales representatives and management.

150.    According to internal Aegerion records, by December 2013, Aegerion had 374 Juxtapid patients.  Assuming that no further Medicare prescriptions were obtained beyond the fall of 2013 (*i.e.*, when 90 or so Medicare patients existed), then roughly 24% of the total Juxtapid patient population was on Medicare, with likely more on other Government Healthcare Programs. The true numbers are likely even higher.

151.    Other internal documents further show that Aegerion regularly targeted patients covered by Medicare.  For example, a series of May 2013 slide presentations entitled Executive Dashboard Review and U.S. Executive Business Review contained several slides that highlighted the significant number of patients on Juxtapid that were paid in whole or in part by Government Healthcare Programs:

## Approved Patients with CoInsurance

|  | Number of Patients | % of Total | % of Patients with Co-Insurance |
|---|---|---|---|
| **Total Approved Patients** | 112 | | |
| **Patients with Co-Insurance** | 30 | 27% | |
| **Standard Co-Insurance** | 3 | | 10% |
| **Medicare Part D w/CoIns** | 24 | | 80% |
| **Capped Co-Insurance** | 3 | | 10% |
| **Totals** | 30 | | 100% |

42

## Juxtapid Payer Coverage

| Payer | # Lives | Status |
|---|---|---|
| Aetna | 18,300,000 | Neutral |
| AK Medicaid | 63,000 | Positive |
| AvMed | 310,000 | Positive |
| BCBS AL | 1,100,000 | Neutral |
| BCBS LA | 1,500,000 | Neutral |
| BCBS MI | 4,430,000 | Neutral |
| BCBS NEPA | 530,000 | Restrictive |
| BCBS RI | 485,000 | Positive |
| BS California | 2,700,000 | Neutral |
| Capital BC Part D | 50,000 | Positive |
| Capital HP FL | 140,000 | Positive |
| CO Medicaid | 515,000 | Positive |
| CVS/Caremark | 50,000,000 | Restrictive |

| Payer | # Lives | Status |
|---|---|---|
| Excellus | 1,700,000 | POSITIVE |
| FL Medicaid | 1,100,000 | Positive |
| GA Medicaid | 520,000 | POSITIVE |
| Horizon BCBS | 1,740,000 | Neutral |
| Humana | 7,100,000 | Positive |
| Medica | 1,600,000 | Positive |
| MT Medicaid | 230,000 | Positive |
| OK Medicaid | 745,000 | POSITIVE |
| Oxford | 3,200,000 | Positive |
| UHC | 34,000,000 | Positive |
| UPMC | 590,000 | Restrictive |
| WY Medicaid | 70,000 | Positive |

49

## Juxtapid Paid Claims Listed By Payer

| | | |
|---|---|---|
| AARP (UHC) Medicare Part D | Care Improvement Plus | Medica |
| Aetna | Catamaran | Medicaid AL |
| Anthem BCBS | CIGNA | Medicaid CA (MediCal) |
| Argus | CIGNA/Bravo Medicare Part D | Medicaid MS (Magnolia) |
| BCBS AL | Coventry | Medicaid PA |
| BCBS FL | CVS Caremark | Medicaid WI (Forward Health) |
| BCBS IL | CVS CMK SilverScript Part D | Medical Mutual of Ohio |
| BCBS MD | ESI | MedImpact |
| BCBS MA | Harvard Pilgrim | OptumRx |
| BCBS MI | HealthNet | Oxford (UHC) |
| BCBS MN | Humana | Prime Therapeutics |
| BCBS MS | Humana Medicare Part D | TriCare for Life |
| BCBS NC | Independence BCBS | UnitedHealthCare (UHC) |
| BCBS SC | Informed Rx | US Scripts |
| BCBS UT | Medco | Wellmark BCBS Iowa |
| BLUE SHIELD OF CA | MedCost Preferred | |

50

- 52 -

## State Medicaid Fee For Service Coverage

| State | Payer kit | Pres. | Fut. Appt. Conf. | State | Payer kit | Pres. | Fut. Appt. Conf. | State | Payer kit | Pres. | Fut. Appt. Conf. |
|---|---|---|---|---|---|---|---|---|---|---|---|
| AK | X | | | KY | X | X | | NY | X | | |
| AL | X | | | LA | X | X | | OH | X | X | |
| AR | X | X | X | MA | X | | | OK | X | X | X |
| AZ | X | | | Magellan | X | X | | OR | X | X | X |
| CA | X | | | MD | X | | X | PA | X | | X |
| CO | X | X | | ME | X | X | X | RI | X | | |
| CT | X | X | | MI | X | | X | SC | X | | X |
| DC | X | X | | MN | X | X | | SD | X | X | |
| DE | X | X | | MO | X | | | TN | X | | X |
| FL | X | | | MS | X | X | | TX | X | | |
| GA | X | X | | MT | X | X | | UT | X | | X |
| Goold | X | X | X | NC | X | | X | VA | X | | X |
| HI | X | | | ND | X | X | X | VT | X | | |
| IA | X | | | NE | X | X | | WA | X | | X |
| ID | X | X | X | NH | X | | | WI | X | | X |
| IL | X | | | NJ | X | | | WV | X | X | |
| IN | X | | X | NM | X | | | WY | X | X | |
| KS | X | | | NV | X | | X | Xerox | X | | X |

152.    Further, in the summer of 2013, Defendants Fraser, Beer, and Fenner were on an email string discussing a doctor who claimed to have "up to 20 patients that could fit the need for Juxtapid potentially, but he believes about 10 or so would be more appropriate candidates."  As Defendants were explicitly told, ninety percent (90%) of this doctors' practice was comprised of Medicare and Medicaid recipients.

153.    Internal Aegerion documents provide evidence establishing that certain patients receiving Juxtapid were covered under Government Healthcare Programs such as Medicare.  The following chart was prepared by Relators based upon said internal documents listing Aegerion's Juxtapid patients known to have been covered, in whole or in part, under Medicare or other Government Healthcare Programs ("Chart A").  Importantly, Chart A only encompasses patients receiving Juxtapid as of March, 2013, which was only three months after the drug hit the market.  Thus, it is reasonable to infer that these numbers grew significantly.

**CHART A:  Juxtapid Patients Covered by Government Healthcare Programs**

| Patient Code Name | DOB | Referral Date | Current Rx | Carrier | LDL | Apheresis | Current Chol. Drug | Prior Chol. Drug | Ship Date |
|---|---|---|---|---|---|---|---|---|---|
| PT1 | 1/##/1972 | 2/15/2013 | 5 mg. x 2 weeks then elevate to 10 mg daily | Bravo Medicare Advantage/Medicaid (Access) | 479 | Y | Y | Y | 3/3/2013 |
| PT2 | 1/##/1965 | 1/21/2013 | 5 mg. daily | Medical Mutual and Medco | 286 | N | N | Y | 1/28/2013 |
| PT3 | 5/##/1956 | 1/8/2013 | 5 mg. daily | Part D: ExpressScripts | 32 | N | Y | Y | 2/1/2013 |
| PT4 | 1/##/1946 | 1/8/2013 | 5 mg. daily | Part D: Medco (Retirement benefit: BCBS MI) | | | | | 3/5/2013 |
| PT5 | 9/##/1949 | 3/4/2013 | 5 mg daily | Medicare/ SilverScripts Part D | 170 | Y | Y | Y | 3/19/2013 |
| PT6 | 5/##/1947 | 2/7/2013 | 5 mg. daily | Medicare/Tricare for Life | 220 | N | N | Y | 2/22/2013 |
| PT7 | 2/##/1941 | 1/2/2013 | 5 mg. daily | Part D: Medco (Care Improvement Plus [MA]) | | | | | 2/26/2013 |
| PT8 | 9/##/1936 | 1/30/2013 | 5 mg. daily | Part D Medicare | 176 | N | Y | Y | 2/28/2013 |
| PT9 | 2/##/1949 | 2/19/2013 | 5 mg daily (90 capsules) | Medicare/Part D First Health | | | | | 3/14/2013 |
| PT10 | 9/##/1953 | 1/11/2013 | 5 mg. daily | Disability: MedicareAccess - AZ Part D - Medco | | | | | 2/5/2013 |
| PT11 | 1/##/1967 | 1/24/2013 | 5 mg. daily | Aetna is primary with CVS Caremark PBM- Secondare: Medicare A/B disability (Navajo Indian) | | | | | 2/6/2013 |
| PT12 | 10/##/1978 | 3/20/2013 | 5 mg. daily | Medicare/Medco Part D | | | | | 3/22/2013 |
| PT13 | 2/##/1952 | 2/5/2013 | 5 mg. daily | Part D/LIS InformedRx | 523 | | | | 2/25/2013 |
| PT14 | 7/##/1949 | 2/28/2013 | 5 mg daily | Medicare/ SilverScripts Part D/Medicaid (CO) | | | | | 3/7/2013 |
| PT15 | 12/##/1946 | 1/2/2013 | 5 mg. daily | Humana HMO/Humana Part D | | | | | 3/13/2013 |

### 2. Sales to Non-HoFH Patients

154.    While Defendants kept the specifics of these off-label sales to Government Healthcare Programs under wraps, based on Relators' analysis, a significant portion of the Government Healthcare Programs' patients did not have HoFH and, instead were prescribed Juxtapid for non-medically accepted indications.

155.    ***The age of the patients does not support a diagnosis of HoFH.***  As detailed above, HoFH is an exceedingly rare, life-threatening disease which presents as early as the first twelve years of life and, left untreated, has a life expectancy of 33 years of age—which Aegerion's own internal materials plainly acknowledge.   Defendants, however, found scores of patients, purportedly with HoFH who had amazingly survived long into their 50s, 60s, 70s, and beyond. For example, Medicare part D subscriber, PT 8 (on Chart A),[6] a patient born in 1936, received a prescription for Juxtapid.  PT 8's medication was shipped on February 28, 2013, when the patient was 76 years old.   Similarly, Medicare recipient, PT 7 a patient born in 1941, received a prescription for Juxtapid written on January 2013, just prior to the patient's 72nd birthday. Moreover, of the 15 individuals listed in Chart A above, 14 (or 93%) were older than 40 as of 2013.

156.    ***The LDL levels of the patients does not support a diagnosis of HoFH.***  In most cases on Chart A, the LDL levels are inconsistent with a diagnosis of HoFH.  Aegerion's internal records state that the typical LDL levels for untreated HoFH patients are in excess of 500, as reflected on the following document that was part of an Aegerion presentation to the FDA on October 17, 2012.

---

[6] For confidentiality reasons, Relators have removed personal identifiers from the charts.

157.    Even in cases where an HoFH patient was previously treated, Aegerion acknowledged that the LDL levels would range from 300-750.  Below is a chart Aegerion presented to the FDA during the application process on October 17, 2012 that demonstrates the "typical" LDL levels for HoFH patients that were currently undergoing or had previously undergone treatment:



158.    The results from Chart A are wholly inconsistent with a diagnosis of HoFH, whether the patient underwent prior treatment or not.  Only one patient on Chart A has reported LDL levels that exceeded 500, and that person was 61 years old in 2013.  Many of the Medicare patients listed in Aegerion's records possess LDL levels as low as the 100's and mid/low-200's. In fact, of the seven individuals with reported LDL information who currently were or previously had been on different cholesterol drug, five had LDL levels below 300, including some in the mid-170 and below.

159.    The same internal Aegerion documents provide strong circumstantial evidence (specifically, patient age and LDL levels) that even more Juxtapid patients received full or partial Medicare reimbursement.  The following is a list of those patients compiled by Relators based on the same internal records from March 2013.  Although the internal documents for this category of patients does not specify the form of health coverage, it can be inferred from the advanced age of these patients and their LDL levels that many, if not all, of the patients received federal reimbursement for Juxtapid and did not have HoFH.

**CHART B:  Juxtapid Patients Likely Covered by Government Healthcare Programs**

| Patient code name | Birth Date | Date of SMN[7] | LDL | Apheresis | Current Chol. Drug | Prior Chol. Drug |
|---|---|---|---|---|---|---|
| PT16 | 8/##/1930 | 7/17/2013 | 212 | N | | Y |
| PT17 | 10/#/1931 | 9/3/2013 | 186 | N | | |
| PT18 | 11/#/1937 | 5/30/2013 | 128 | N | Y | N |
| PT19 | 5/##/1939 | 10/2/2013 | 189.6 | N | N | N |
| PT20 | 3/#/1939 | 10/9/2013 | 168 | N | | |
| PT21 | 5/##/1939 | 5/1/2013 | 140 | N | Y | Y |
| PT22 | 6/#/1939 | 2/16/2013 | 206 | Y | Y | Y |
| PT23 | 9/##/1940 | 10/9/2013 | 196 | N | | |
| PT24 | 5/##/1941 | 6/27/2013 | 180 | N | Y | Y |
| PT25 | 2/##/1941 | 5/29/2013 | 176 | N | Y | Y |
| PT26 | 5/##/1941 | 1/21/2013 | 252 | N | N | Y |
| PT27 | 1/#/1942 | 4/1/2013 | 175 | N | | |
| PT28 | 10/##/1941 | 10/16/2013 | 222 | N | | |
| PT29 | 4/##/1942 | 10/17/2013 | 161 | N | | |

---

[7]       SMN refers to Statement of Medical Necessity.

160.    Medicare is primarily available to Americans over the age of 65 and to younger individuals with permanent disabilities.  It is estimated that approximately 49 million individuals are on Medicare.  With only about 45 million total individuals over age 65 in the United States, the odds are high that many of the individuals listed above in Chart B receive Medicare benefits.  Indeed, some reports have indicated that Medicare has achieved near universal coverage for Americans over 65.  Therefore, it is likely that payment for many of the patients listed in Chart B was provided, in whole or in part, by Medicare.  Further, none of the patients listed in Chart B possessed LDL levels even close to 500; in most cases those patients reported LDL levels in the 100-250 range, which is inconsistent with an HoFH diagnosis (treated or untreated).

## C.    Government Damages Caused by Off-Label Marketing

161.    Defendants' actions detailed herein have caused the submission of false and fraudulent claims to the United States and to the Plaintiff States.  The United States government and the Plaintiff States have sustained monetary damages as a result of Defendants' actions, which also have endangered patient lives.

162.    The fact that many hundreds of prescriptions presented to Government Healthcare Programs were for patients who did not have HoFH was a material fact, which if known to the United States, would have resulted in the denial of reimbursement for those prescriptions.

163.    Juxtapid was aggressively priced by Aegerion when it first reached the market at $235,000 for a year's therapy.  Then, over the next 18 months following FDA approval, the price skyrocketed an additional 40%, as reflected below:

| Date | Price | Percentage Increase |
|------|-------|---------------------|
| 12/21/12 | $235,000 | |
| 6/1/13 | $295,000 | 23% |
| 1/2/14 | $311,000 | 5.5% |
| 6/1/14 | $329,587 | 5.9% |

## VII. <u>DEFENDANTS' JOINT AND SEVERAL LIABILTY</u>

164.     Defendants are jointly and severally liable to the United States for the damages under the FCA, 31 U.S.C. § 3729, *et seq.*

165.     **<u>Defendant Beer.</u>** Defendant Beer is jointly and severally liable for damages caused to the United States government for his part in making, and causing to be made, false claims for payment.  Beer and other Defendants knowingly devised and implemented an off-label marketing scheme intended to inflate the number of potential consumers of Juxtapid, in order to drive up profits.  Beer engaged in internally publicized competition with other executives to obtained prescriptions for Juxtapid for patients, regardless of whether they had HoFH.  Beer misled investors and the public about the true U.S. population of HoFH patients and pressured sales representatives to market and obtain off-label sales of Juxtapid.  Furthermore, Beer personally and intentionally misbranded Juxtapid in his statements on *Fast Money*, for which he was reprimanded by the FDA.

166.     Defendant Beer had actual knowledge of the falsity of the claims on the United States that resulted from Defendants' illegal acts, and/or he acted with deliberate ignorance of the truth or falsity of these claims and/or acted in reckless disregard of the truth or falsity of these claims.

167.     During the period from August 15, 2013 to March 26, 2014, Defendant Beer traded Aegerion stock for a net gain of $8,775,575.  Such profits are also evidence that Defendant Beer condoned and encouraged the illegal activity of other Defendants in this case.

168.     **<u>Defendant Detloff.</u>** Defendant Detloff is jointly and severally liable for damages caused to the United States for her part in making, and causing to be made, false claims for payment.  Detloff and other Defendants knowingly devised and implemented an off-label

marketing scheme intended to inflate the number of potential customers of Juxtapid in order to drive up profits. Detloff was an active participant and leader in this scheme. Detloff presented "best practices" at the Las Vegas National Sales meeting that encouraged aggressive sales tactics. Detloff encouraged sales representatives to usurp the role of the doctor by personally completing statements of medical necessity, deliberately modifying or misrepresenting information to better ensure approval of and reimbursement for the prescriptions. Detloff herself achieved extremely high sales of Juxtapid through off-label marketing, making her the number two LSM during the first half of 2013. Further, Detloff was the listed salesperson for three Medicare patients on Chart A (PT 12-PT14), *supra*, which, as previously stated, encompasses only approximately a three-month period of Juxtapid sales.

169.    Defendant Detloff had actual knowledge of the falsity of the claims on the United States that resulted from Defendants' illegal acts, and/or she acted with deliberate ignorance of the truth or falsity of these claims and/or acted in reckless disregard of the truth or falsity of these claims.

170.    **Defendant Dull**. Defendant Dull is jointly and severally liable for damages caused to the United States for his part in making, and causing to be made, false claims for payment. Defendants knowingly devised and implemented an off-label marketing scheme intended to inflate the number of potential customers of Juxtapid in order to drive up profits. As national sales director, Dull was an active participant and leader in this scheme. Defendants Dull and Fenner took lead roles in pre-launch training sessions with the Aegerion sales team. For example, at a multi-day meeting in Boston in mid-December, 2012, Dull and Fenner are listed on the agenda as speaking to the assembled employees to set each day's agenda in the morning and recap each day's events each afternoon. Dull, along with other senior personnel at Aegerion monitored and

observed Defendant Detloff's "best practices" presentation at the Las Vegas National Sales Meeting, without ever expressing disapproval or correcting the unlawful directives given. When sales representative Slavodnik reported his data mining activities, Defendant Dull used Slavodnik's techniques in the search for "potential HoFH and Juxtapid" patients as a lesson for the entire sales force.

171.   Defendant Dull had actual knowledge of the falsity of the claims on the United States that resulted from Defendants' illegal acts, and/or he acted with deliberate ignorance of the truth or falsity of these claims and/or acted in reckless disregard of the truth or falsity of these claims.

172.   **Defendant Fenner.**  Defendant Fenner is jointly and severally liable for damages caused to the United States government for his part in making, and causing to be made, false claims for payment.  Fenner and other Defendants knowingly devised and implemented an off-label marketing scheme intended to inflate the number of potential consumers of Juxtapid, in order to drive up profits.  Defendants Dull and Fenner took lead roles in pre-launch training sessions with the Aegerion sales team.  In particular, at a multi-day meeting in Boston in mid-December, 2012, Dull and Fenner are listed on the agenda as speaking to the assembled employees to set each day's agenda in the morning and recap each day's events each afternoon.   Later, Fenner engaged in competition with other executives in which he sought, and obtained, prescriptions for Juxtapid for patients whom he knew did not have HoFH.  Fenner also instructed Aegerion sales representatives to deliberately mislead doctors about the true nature of HoFH and "open up minds" to an expanded patient population.  Fenner encouraged sales representatives only to pay speaking fees to those who were willing to expand the definition of HoFH along company lines.

173.    Defendant Fenner had actual knowledge of the falsity of the claims on the United States that resulted from Defendants' illegal acts, and/or he acted with deliberate ignorance of the truth or falsity of these claims and/or acted in reckless disregard of the truth or falsity of these claims.

174.    **Defendant Fitzpatrick.** Defendant Fitzpatrick is jointly and severally liable for damages caused to the United States for her part in making, and causing to be made, false claims for payment.  Fitzpatrick and other Defendants knowingly devised and implemented an off-label marketing scheme intended to inflate the number of potential customers of Juxtapid in order to drive up profits.  As CFO, Fitzpatrick knew that the Company's actual revenue as well as its predicted revenue, was beyond that which could be achieved through on-label sales.

175.    Fitzpatrick was complicit in a scheme to obfuscate patient numbers to the investing public through the twin artifices of regular price increases and the eventual refusal to discuss patient numbers which Beer announced in his presence on the July 30, 2013 Q2 investor call. Fitzpatrick appeared on every quarterly investor call from the first quarter of sales through Q2 2014, at which point he was replaced as CFO.

176.    In the course of his final investor conference call on July 29, 2014, and at a time the one-drug Company had already saturated the on-label market, Fitzpatrick confidently asserted that, "Based upon our current forecasts, we believe the upfront investments we've made have optimized our U.S. commercial operations to a scale that we expect *will support our U.S. growth* for the next 3 years, but we will continually asses our size and investments related to the U.S. HoFH market opportunity." (Emphasis added).  During those quarterly investor calls, Fitzpatrick added his seal of approval to the Company's "glowing financial predictions", which, as Dr. Wolfe predicted, "ultimately depend[ed] on sales for off-label use."

177.    Defendant Fitzpatrick had actual knowledge of the falsity of the claims on the United States that resulted from Defendants' illegal acts, and/or he acted with deliberate ignorance of the truth or falsity of these claims and/or acted in reckless disregard of the truth or falsity of these claims.

178.    During the period from August 14, 2013 to March 4, 2014, Defendant Fraser traded Aegerion stock for a net gain of $1,214,626.   Such profits are also evidence that Defendant Fitzpatrick condoned and encouraged the illegal activity of other Defendants in this case.

179.    **Defendant Fraser.**   Defendant Fraser is jointly and severally liable for damages caused to the United States government for his part in making, and causing to be made, false claims for payment.   Fraser and other Defendants knowingly devised and implemented an off-label marketing scheme intended to inflate the number of potential consumers of Juxtapid, in order to drive up profits.   Fraser engaged in competition with other executives in which he sought, and obtained, prescriptions for Juxtapid for patients without regard for whether the patients suffered from HoFH.   Fraser also instructed sales representatives to deliberately mislead doctors about the true nature of HoFH and proposed sales pitches to help them to do so.   Fraser stated openly to participants on a national team conference call that the goal was to reach 3,750 patients for Juxtapid both "on and off label."

180.    Defendant Fraser had actual knowledge of the falsity of the claims on the United States that resulted from Defendants' illegal acts, and/or he acted with deliberate ignorance of the truth or falsity of these claims and/or acted in reckless disregard of the truth or falsity of these claims.

181. During the period from October 7, 2013 to December 2, 2013, Defendant Fraser traded Aegerion stock for a net gain of $2,242,190. Such profits are also evidence that Defendant Fraser condoned and encouraged the illegal activity of other Defendants in this case.

182. **Defendant Frigge.** Defendant Frigge is jointly and severally liable for damages caused to the United States for his part in making, and causing to be made, false claims for payment. Frigge and other Defendants knowingly devised and implemented an off-label marketing scheme intended to inflate the number of potential customers on Juxtapid in order to drive up profits. Frigge was an active participant and leader in this scheme. Frigge authored a letter of introduction to potential prescribers which, consistent with the Company's strategy to obfuscate the nature of Juxtapid and the definition of HoFH, misled the reader as to the labelled indication of Juxtapid. Frigge used this letter himself and advised others to send similar letters in order to achieve off label sales. Frigge also participated in the patient "hunt" that crassly encouraged off-label sales. Frigge was the most successful sales representative at Aegerion, achieving 29 prescriptions within the first six months of Juxtapid's market launch. Further, Frigge was the listed salesperson for three of the Medicare patients on Chart A (PT2, PT3 and PT4) and one likely Medicare patient on Chart B (PT26), *supra*, which, as previously stated, encompass only approximately a three-month period of Juxtapid sales.

183. Defendant Frigge had actual knowledge of the falsity of the claims on the United States that resulted from Defendants' illegal acts, and/or he acted with deliberate ignorance of the truth or falsity of these claims and/or acted in reckless disregard of the truth or falsity of these claims.

184.   **Defendant Dr. Rader.**   Defendant Dr. Rader is jointly and severally liable for damages caused to the United States government for his part in conspiring to cause breaches of the FCA and for making, or causing to be made, false claims for payment.

185.   Dr. Rader, using his authority as the Director of the Preventative Cardiovascular Medicine and Lipid Clinic, and Associate Director of the Institute of Translational Medicine and Therapeutics at the University of Pennsylvania, conspired with Defendant Scheer to establish Aegerion as a company ostensibly serving the needs of the HoFH population, but all the while the goal of the conspiracy was to sell Juxtapid into the off-label market knowing that any claims for government reimbursement would be false claims.   Further, Dr. Rader conspired with Aegerion and the other Individual Defendants to promote Juxtapid for use beyond the limited HoFH population, including making public assertions inflating the purported size of the potential market for Juxtapid that directly contradicted his prior statements that HoFH was a one in a million disease.   By highlighting Dr. Rader's and UPenn's reputations, Defendants intended to convince doctors to prescribe Juxtapid to treat a broader range of non-approved, off-label conditions.

186.   Dr. Rader is also liable for making, or causing to be made, false claims by pursuing his off-label agenda through false statements to the FDA and false statements to investors and industry representatives.   Dr. Rader's false statements about the patient population cannot be put down to ignorance.   Dr. Rader is intimately familiar with HoFH, its signs, and its consequences. According to his testimony before the FDA, he had treated fifty patients with the disease.   He was thus in a better position than anyone else to comprehend that the blistering pace of Juxtapid prescriptions was diametrically opposed to the prevalence of HoFH in the population as a whole.

187.   In all written presentations to the FDA, Dr. Rader held himself out as being affiliated with UPenn, acting within the scope of his employment. Indeed, the FDA addressed

official correspondence with Defendant Dr. Rader directly to the University of Pennsylvania, School of Medicine in Philadelphia, including when providing official minutes of FDA teleconferences.  Elsewhere in FDA minutes and transcripts Defendant Dr. Rader's affiliation with UPenn is noted.

188.    Defendant Dr. Rader had actual knowledge of the falsity of the claims on the United States that resulted from Defendants' illegal acts, and/or he acted with deliberate ignorance of the truth or falsity of these claims and/or acted in reckless disregard of the truth or falsity of these claims.

189.    **Defendant Dr. Sumeray.**  Defendant Dr. Sumeray is jointly and severally liable for damages caused to the United States government for his part in making, or causing to be made, false claims for payment.  As Chief Medical Officer of Aegerion, he knew the extent of the FDA approval of Juxtapid and knew that the Company was going deep into off-label sales.  Dr. Sumeray participated in investor conference calls and made false statements about the patient population for HoFH.  Over time, Company executives' lies about the patient population became more exaggerated as the sales went deeper into the off-label market.  During the Q2, 2014 earnings call, Steve Byrne of Bank of America, Merrill Lynch, asked Dr. Sumeray a direct question on the patient population:  "And would you suggest that's still in the 3,000 to 5,000 range within the U.S.?"  Dr. Sumeray unequivocally affirmed:  "Yes, certainly.  Our current best estimate is that it's around the 3,000-patient mark in the U.S. for adult HoFH."

190.    These statements might come as a surprise to the FDA committee who heard Dr. Sumeray explain that with respect to the Phase III study for Juxtapid:  "In order to find at least 20 patients with homozygous FH, the study was conducted at 11 sites in four countries where there was known to be a founder effect and a high incidence or prevalence of the LDL receptor gene

defect."  In other words, to find 20 candidates with HoFH, not only did the study require 11 centers, it was necessary to scour four countries—but not just any countries; countries that were known to have a disproportionate number of HoFH patients due to the so-called founder effect (small gene pools lacking genetic variation).

191.    At the same FDA meeting, a Dr. Alexander asked Dr. Sumeray:  "[A]re you suggesting that it's expected that they'll [sic] be no more than 300 patients in the United States that will be using this therapy because it will be those with homozygous HF?"  Dr. Sumeray responded summarily, "Right."  Dr. Sumeray spoke truthfully before the FDA and, when it suited his purposes to expand off-label sales, he lied.

192.    Defendant Dr. Sumeray had actual knowledge of the falsity of the claims on the United States that resulted from Defendants' illegal acts, and/or he acted with deliberate ignorance of the truth or falsity of these claims and/or acted in reckless disregard of the truth or falsity of these claims.

193.    Between April 22, 2013 and March 14, 2014, Dr. Sumeray sold his award of 47,000 shares of Aegerion as they vested for a net gain of $2,526,450.  Such profits are also evidence that Defendant Dr. Sumeray condoned and encouraged the illegal activity of other Defendants in this case.

194.    **Defendant UPenn.**  Defendant UPenn is vicariously liable for Dr. Rader's unlawful actions.  At all times relevant to this complaint, Dr. Rader acted with actual or apparent authority of UPenn.  Dr. Rader also acted within the scope of his employment at UPenn.  Indeed, as Associate Director of the Institute of Translational Medicine and Therapeutics at the University of Pennsylvania, Dr. Rader's job was the commercialization of scientific research, including the drug that would be known as Juxtapid.  Dr. Rader acted at all times both for his own benefit and for that

of his employer.   Moreover, UPenn as an institution cannot claim ignorance as to Dr. Rader's actions.   Indeed, during Dr. Rader's initial meetings with the FDA towards approval of Lomitapide, there were multiple UPenn medical professors and/or administrators present, as reflected in FDA minutes.   By subsequently licensing Lomitapide to Aegerion, and accepting tens of millions of dollars in proceeds from the licensing agreement and receiving quarterly reports detailing the Juxtapid sales and forecasts, UPenn did nothing to discourage or curtail Dr. Rader's conduct and, in fact, benefitted from his unlawful behavior.

195.   **<u>Defendant Scheer.</u>**   Defendant Scheer is jointly and severally liable for damages caused to the United States government for his part in making, or causing to be made, false claims for payment.

196.   Defendant Scheer conspired with the other Individual Defendants to establish Aegerion as a company ostensibly serving the needs of the HoFH population, but all the while the goal of the conspiracy was to sell Juxtapid into the off-label market knowing that any claims for government reimbursement would be false claims.   The false claims that resulted from the off-label marketing scheme did not just happen on Scheer's watch, they are the fruit of his personal project.   Even if the submission of these false claims were not Scheer's goal from the beginning, as the chief architect of Aegerion, and one of only two Class 3 directors of the Company (Beer was the other), Scheer would have known that Aegerion could not have achieved its peak sales, in excess of the entire patient population in the United States, without trespassing into off-label marketing.

197.   Defendant Scheer is also liable for making, or causing to be made, false claims by pursuing his off-label agenda through his stewardship of Aegerion; Scheer incorporated the Company; served as Chairman of the Board; served on the Compensation Committee and profited

from other Defendants' false statements to the FDA and false statements to investors and industry representatives.

198.    Defendant Scheer had actual knowledge of the falsity of the claims on the United States that resulted from Defendants' illegal acts, and/or he acted with deliberate ignorance of the truth or falsity of these claims and/or acted in reckless disregard of the truth or falsity of these claims.

199.    During the period August 21, 2013 to August 27, 2013, Defendant Scheer traded Aegerion stock for a net gain of $1,696,000.  Such profits are also evidence that Scheer condoned and encouraged the illegal activity of other Defendants in this case.

## VIII.   CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### VIOLATION OF 31 U.S.C. § 3729 (a)(1)(A)
### (AGAINST AEGERION AND THE INDIVIDUAL DEFENDANTS)

200.    Relators repeat and reallege the allegations set forth in Paragraph 1 through 199 as though set forth herein.

201.    As described in detail above, Aegerion and the Individual Defendants have knowingly presented, or caused to be presented, numerous false or fraudulent claims to the United States through the Medicare program and other Government Healthcare Programs for reimbursement of prescriptions of Juxtapid caused by off-label marketing for unapproved uses. The uses in question are ones that the FDA specifically has refused to allow Aegerion and the Individual Defendants to market, and there are no citations or supporting references in any of the federally-recognized compendia.

202.    Such statements are false and Aegerion and the Individual Defendants knew they were false or acted with deliberate ignorance, or acted with reckless disregard that their actions

would cause Medicare and other Government Healthcare Programs to sustain damages for reimbursement of payment for unapproved uses of Juxtapid.

203.    Aegerion's and the Individual Defendants' false statements were material to the decision of governmental payors to pay such false or fraudulent claims.

204.    As a result of the false statements, millions of dollars have been and/or will be spent by Medicare and other Government Healthcare Programs for unapproved uses of Juxtapid that are not reimbursable under federal rules and regulations.

**SECOND CAUSE OF ACTION**
**VIOLATION OF 31 U.S.C. § 3729(a)(1)(B)**
**(AGAINST AEGERION AND THE INDIVIDUAL DEFENDANTS)**

205.    The Relators repeat and reallege all of the allegations set forth in paragraphs 1 through 204 as though set forth herein.

206.    In the regular course of business, Aegerion and the Individual Defendants knowingly made, used, or caused to be made or used, false records or statements which were material to false or fraudulent claims.  Aegerion and the Individual Defendants made false records and/or statements in the sale and marketing of Juxtapid for unapproved uses.  The uses in question are ones that the FDA specifically has refused to allow Aegerion and the Individual Defendants to market, and there are no citations or supporting references in any of the federally-recognized compendia.

207.    Such statements are false and Aegerion and the Individual Defendants knew they were false or acted with deliberate ignorance, or acted with reckless disregard that their actions would cause Medicare and other Government Healthcare Programs to sustain damages for unapproved uses of Juxtapid.

- 70 -

208.    Aegerion's and the Individual Defendants' false statements were material to the decision of governmental payors to pay such false or fraudulent claims.

209.    As a result of the false statements, millions of dollars have been and/or will be spent by Medicare and other Government Healthcare Programs for unapproved uses of Juxtapid that are not reimbursable under federal rules and regulations.

### THIRD CAUSE OF ACTION
### VIOLATION OF 31 U.S.C. § 3729(a)(1)(C)
### (AGAINST THE INDIVIDUAL DEFENDANTS)

210.    The Relators repeat and reallege all of the allegations set forth in paragraphs 1 through 209 as though set forth herein.

211.    The Individual Defendants conspired by agreement to commit a breach of the FCA.

212.    The Individual Defendants have each committed acts detailed in this complaint in furtherance of their agreement.

213.    The Individual Defendants committed these acts knowing, or in deliberate ignorance or with reckless disregard, that their actions would result in false claims upon the federal government.  As a result of the false statements, millions of dollars have been and/or will be spent by Medicare and other Government Healthcare Programs for unapproved uses of Juxtapid that are not reimbursable under federal rules and regulations.

### FOURTH CAUSE OF ACTION
### CALIFORNIA FALSE CLAIMS ACT
### CAL. GOV'T. CODE § 12650, *ET SEQ*.
### (AGAINST AEGERION AND THE INDIVIDUAL DEFENDANTS)

214.    Relators repeat and reallege the allegations set forth in paragraphs 1 through 213 as if fully set forth herein.

215.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented to an officer or employee of the State of California or of any political subdivision thereof, a false claim for payment or approval, in violation of Cal. Gov't Code § 12651(a)(1).

216.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used a false record or statement to get a false claim paid or approved by the State of California or by any political subdivision, in violation of Cal. Gov't Code § 12651(a)(2).

217.    The State of California, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants as alleged herein.

218.    By reason of Defendants' acts, the State of California has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

219.    Pursuant to Cal. Gov't Code § 12651(a), the State of California is entitled to three times the amount of actual damages plus the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

### FIFTH CAUSE OF ACTION
### COLORADO MEDICAID FALSE CLAIMS ACT
### CRS § 25.5-4-304, *ET SEQ.*
### (AGAINST AEGERION AND THE INDIVIDUAL DEFENDANTS)

220.    Relators repeat and reallege the allegations set forth in paragraphs 1 through 219 as if fully set forth herein.

221.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented to an officer or employee of a Colorado agency a false claim for payment or approval, in violation of CRS § 25.5-4-305(a).

222.     By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used a false record or statement to get a false or fraudulent claim paid or approved by a Colorado agency, in violation of CRS § 25.5-4-305(b).

223.     The State of Colorado, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants as alleged herein.

224.     By reason of Defendants' acts, the State of Colorado has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

225.     Pursuant to CRS § 25.5-4-305(a), the State of Colorado is entitled to three times actual damages plus the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

**SIXTH CAUSE OF ACTION**
**CONNECTICUT FALSE CLAIMS ACT**
**CONN. GEN. STAT. ANN. § 4-274, *ET SEQ.***
**(AGAINST AEGERION AND THE INDIVIDUAL DEFENDANTS)**

226.     Relators repeat and reallege the allegations set forth in paragraphs 1 through 225 as if fully set forth herein.

227.     By virtue of the acts described above, Defendants knowingly presented or caused to be presented to an officer or employee of a Connecticut agency a false claim for payment or approval, in violation of Conn. Gen. Stat. § 17b-301b(a)(1).

228.     By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used a false record or statement to get a false or fraudulent claim paid or approved by a Connecticut agency, in violation of Conn. Gen. Stat. § 17b-301b(a)(2).

229.     The State of Connecticut, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants as alleged herein.

230.     By reason of Defendants' acts, the State of Connecticut has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

231.     Pursuant to Conn. Gen. Stat. § 17b-301b(a), the State of Connecticut is entitled to three times actual damages plus the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## SEVENTH CAUSE OF ACTION
## DELAWARE FALSE CLAIMS AND REPORTING ACT
## 6 DEL. CODE § 1201, *ET SEQ.*
## (AGAINST AEGERION AND THE INDIVIDUAL DEFENDANTS)

232.     Relators repeat and reallege the allegations set forth in paragraphs 1 through 231 as if fully set forth herein.

233.     By virtue of the acts described above, Defendants knowingly presented, or caused to be presented, directly or indirectly, to an officer or employee of the State of Delaware a false or fraudulent claim for payment or approval, in violation of 6 Del. C. § 1201(a)(1).

234.     By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used, directly or indirectly, a false record or statement to get a false or fraudulent claim paid or approved by the State of Delaware in violation of 6 Del. C. § 1201(a)(2).

235.     The State of Delaware, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues

- 74 -

to pay the claims that would not have been paid but for the acts and/or conduct of Defendants as alleged herein.

236.    By reason of Defendants' acts, the State of Delaware has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

237.    Pursuant to 6 Del. C. § 1201(a), the State of Delaware is entitled to three times the amount of actual damages plus the maximum penalty of $11,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

**EIGHTH CAUSE OF ACTION**
**FLORIDA FALSE CLAIMS ACT**
**FLA. STAT. § 68.081, *ET SEQ.***
**(AGAINST AEGERION AND THE INDIVIDUAL DEFENDANTS)**

238.    Relators repeat and reallege the allegations set forth in paragraphs 1 through 237 as if fully set forth herein.

239.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented to an officer or employee of a Florida agency a false claim for payment or approval, in violation of Fla. Stat. § 68.082(2)(a).

240.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used a false record or statement to get a false or fraudulent claim paid or approved by a Florida agency, in violation of Fla. Stat. § 68.082(2)(b).

241.    The State of Florida, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants as alleged herein.

242.     By reason of Defendants' acts, the State of Florida has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

243.     Pursuant to Fla. Stat. § 68.082(2)(g), the State of Florida is entitled to three times actual damages plus the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

**NINTH CAUSE OF ACTION**
**GEORGIA STATE FALSE MEDICAID CLAIMS ACT**
**CODE § 49-4-168, *ET SEQ.***
**(AGAINST AEGERION AND THE INDIVIDUAL DEFENDANTS)**

244.     Relators repeat and reallege the allegations set forth in paragraphs 1 through 243 as if fully set forth herein.

245.     By virtue of the acts described above, Defendants knowingly presented or caused to be presented to an officer, employee, fiscal intermediary grantee or contractor of the Georgia Medicaid Program a false claim for payment or approval, in violation of O.G.C.A. § 49-4-168.1(a)(1).

246.     By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the Georgia Medicaid program, in violation of O.G.C.A. § 49-4-168.1(2)(b).

247.     The Georgia Medicaid program, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants as alleged herein.

248.     By reason of Defendants' acts, the State of Georgia has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

249.     Pursuant to O.G.C.A. § 49-4-168.1(a), the State of Georgia is entitled to three times actual damages plus the maximum penalty of $11,000 for each and every false or fraudulent claim, record or statement made, used or caused to be made or used by Defendants.

### TENTH CAUSE OF ACTION
### HAWAII FALSE CLAIMS ACT
### HAW. REV. STAT. § 661-21, *ET SEQ.*
### (AGAINST AEGERION AND THE INDIVIDUAL DEFENDANTS)

250.     Relators repeat and reallege the allegations set forth in paragraphs 1 through 249 as if fully set forth herein.

251.     By virtue of the acts described above, Defendants knowingly presented, or caused to be presented, to an officer or employee of the State of Hawaii a false or fraudulent claim for payment or approval, in violation of Haw. Rev. Stat. § 661-21(a)(1).

252.     By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State of Hawaii, in violation of Haw. Rev. Stat. § 661-21(a)(2).

253.     The State of Hawaii, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants as alleged herein.

254.     By reason of Defendants' acts, the State of Hawaii has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

255.     Pursuant to Haw. Rev. Stat. § 66l-21(a)(8) the State of Hawaii is entitled to three times the amount of actual damages plus the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## ELEVENTH CAUSE OF ACTION
## ILLINOIS FALSE CLAIMS ACT
## 740 ILL. COMP. STAT. § 175/1, *ET SEQ.*
## (AGAINST AEGERION AND THE INDIVIDUAL DEFENDANTS)

256.     Relators repeat and reallege the allegations set forth in paragraphs 1 through 255 as if fully set forth herein.

257.     By virtue of the acts described above, Defendants knowingly presented, or caused to be presented, to an officer or employee of the State of Illinois a false or fraudulent claim for payment or approval in violation of 740 Ill. Comp. Stat. § 175/3(a)(1).

258.     By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State of Illinois, in violation of 740 Ill. Comp. Stat. § 175/3(a)(2).

259.     The State of Illinois, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants as alleged herein.

260.     By reason of Defendants' acts, the State of Illinois has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

261.     Pursuant to 740 Ill. Comp. Stat. § 175/3(a)(7), the State of Illinois is entitled to three times the amount of actual damages plus the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## TWELFTH CAUSE OF ACTION
## INDIANA FALSE CLAIMS AND WHISTLEBLOWER PROTECTION ACT
## IND. CODE. § 5-11-5.5, *ET SEQ.*
## (AGAINST AEGERION AND THE INDIVIDUAL DEFENDANTS)

262.     Relators repeat and reallege the allegations set forth in paragraphs 1 through 261 as if fully set forth herein.

263.     By virtue of the acts described above, Defendants knowingly presented, or caused to be presented, to an officer or employee of the State of Indiana a false or fraudulent claim for payment or approval in violation of Ind. Code §§ 5-11-5.5-2(b)(1) and (8).

264.     By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State of Indiana, in violation of §§ 5-11-5.5-2(b)(2) and (8).

265.     The State of Indiana, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants as alleged herein.

266.     By reason of Defendants' acts, the State of Indiana has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

267.     Pursuant to § 5-11-5.5-2(b), the State of Indiana is entitled to three times the amount of actual damages plus the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

### THIRTEENTH CAUSE OF ACTION
### IOWA FALSE CLAIMS ACT
### IOWA CODE § 685, *ET SEQ.*
### (AGAINST AEGERION AND THE INDIVIDUAL DEFENDANTS)

268.     Relators repeat and reallege the allegations set forth in paragraphs 1 through 267 as if fully set forth herein.

269.     By virtue of the acts described above, Defendants knowingly presented or caused to be presented to an officer or employee of a Iowa agency a false claim for payment or approval, in violation of Iowa Code § 685.2.1.a.

270.     By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used a false record or statement to get a false or fraudulent claim paid or approved by a Iowa agency, in violation of Iowa Code § 685.2.1.b.

271.     The State of Iowa, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants as alleged herein.

272.     By reason of Defendants' acts, the State of Iowa has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

273.     Pursuant to Iowa Code § 685.2.1, the State of Iowa is entitled to three times actual damages plus the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## FOURTEENTH CAUSE OF ACTION
## LOUISIANA FALSE CLAIMS ACT/MEDICAL ASSISTANCE PROGRAMS INTEGRITY LAW
## LA. REV. STAT. § 46:437.1, *ET SEQ.*
## (AGAINST AEGERION AND THE INDIVIDUAL DEFENDANTS)

274.    Relators repeat and reallege the allegations set forth in paragraphs 1 through 273 as if fully set forth herein.

275.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented to the State of Louisiana  false or fraudulent claims, in violation of 46 La. Rev. Stat. Ch. 3 §438.3(A).

276.    By virtue of the acts described above, Defendants knowingly engaged in misrepresentation to obtain, or attempt to obtain, payment from the State of Louisiana medical assistance programs funds, in violation of 46 La. Rev. Stat. Ch. 3 § 438.3(B).

277.    The State of Louisiana, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants alleged herein.

278.    By reason of Defendants' acts, the State of Louisiana has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

279.    Pursuant to 46 La. Rev. Stat. Ch. 3 §§ 438.5 and 438.6, the State of Louisiana is entitled to three times the amount of actual damages plus the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## FIFTEENTH CAUSE OF ACTION
## MARYLAND FALSE HEALTH CLAIMS ACT
## MD. CODE ANN., HEALTH-GEN § 2-601, *ET SEQ.*
## (AGAINST AEGERION AND THE INDIVIDUAL DEFENDANTS)

280.     Relators repeat and reallege the allegations set forth in paragraphs 1 through 279 as if fully set forth herein.

281.     By virtue of the acts described above, Defendants knowingly presented or caused to be presented to an officer or employee of a Maryland agency a false claim for payment or approval, in violation of Md. Code Ann., Health-Gen § 2-602(a)(1).

282.     By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used a false record or statement to get a false or fraudulent claim paid or approved by a Maryland agency, in violation of Md. Code Ann., Health-Gen § 2-602(a)(2).

283.     The State of Maryland, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants as alleged herein.

284.     By reason of Defendants' acts, the State of Maryland has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

285.     Pursuant to Md. Code Ann., Health-Gen § 2-602(b), the State of Maryland is entitled to three times actual damages plus the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

### SIXTEENTH CAUSE OF ACTION
### MASSACHUSETTS FALSE CLAIMS LAW
### MASS. GEN. LAWS CH. 12 § 5A, *ET SEQ.*
### (AGAINST AEGERION AND THE INDIVIDUAL DEFENDANTS)

286.    Relators repeat and reallege the allegations set forth in paragraphs 1 through 285 as if fully set forth herein.

287.    By virtue of the acts described above, Defendants knowingly presented, or caused to be presented to the Commonwealth of Massachusetts, a false or fraudulent claim for payment or approval, in violation of M.G.L. ch. 12 § 5B(l).

288.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used, a false record or statement to obtain payment or approval of a claim by the Commonwealth of Massachusetts or any political subdivision thereof, in violation of M.G.L. ch. 12 § 5B(2).

289.    The Commonwealth of Massachusetts, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants as alleged herein.

290.    By reason of Defendants' acts, the Commonwealth of Massachusetts has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

291.    Pursuant to M.G.L. ch. 12 § 5B(9), the Commonwealth of Massachusetts is entitled to three times the amount of actual damages plus the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

**SEVENTEENTH CAUSE OF ACTION**
**MICHIGAN MEDICAID FALSE CLAIM ACT**
**MICH. COMP. LAWS § 400.601, *ET SEQ.***
**(AGAINST AEGERION AND THE INDIVIDUAL DEFENDANTS)**

292.     Relators repeat and reallege the allegations set forth in paragraphs 1 through 291 as if fully set forth herein.

293.     By virtue of the acts described above, Defendants knowingly caused to be presented to the State of Michigan, a false statement or false representation of a material fact in an application for Medicaid benefits, in violation of M.C.L. § 400.603(l).

294.     By virtue of the acts described above, Defendants knowingly caused to be made a false statement or false representation of a material fact for use in determining rights to a Medicaid benefit under the Michigan Medicaid program, in violation of M.C.L. § 400.603(2).

295.     The State of Michigan, unaware of the falsity of the statements and claims caused to be made, used or presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants as alleged herein.

296.     By reason of Defendants' acts, the State of Michigan has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

297.     Pursuant to M.C.L. § 400.612, the State of Michigan is entitled to three times the amount of actual damages, forfeiture of all amounts received by Defendants and the maximum penalty of $10,000 for each and every false or fraudulent claim made, used, presented or caused to be made, used or presented by Defendants.

## EIGHTEENTH CAUSE OF ACTION
## MINNESOTA FALSE CLAIMS ACT
## MINN. STAT. ANN. § 15C, *ET SEQ.*
## (AGAINST AEGERION AND THE INDIVIDUAL DEFENDANTS)

298.    Relators repeat and reallege the allegations set forth in paragraphs 1 through 297 as if fully set forth herein.

299.    By virtue of the acts described above, Defendants knowingly presented, or caused to be presented, to an officer or employee of a Minnesota agency a false claim for payment or approval, in violation of M.S.A. § 15C.02(a)(1).

300.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used a false record or statement to get a false or fraudulent claim paid or approved by a Minnesota agency, in violation of M.S.A. § 15C.02(a)(2).

301.    The State of Minnesota, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants as alleged herein.

302.    By reason of Defendants' acts, the State of Minnesota has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

303.    Pursuant to M.S.A. § 15C.02(a), the State of Minnesota is entitled to three times actual damages plus the maximum penalty of $11,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## NINETEENTH CAUSE OF ACTION
## MONTANA FALSE CLAIMS ACT
## MONT. CODE ANN. §17-8-401, *ET. SEQ.*
## (AGAINST AEGERION AND THE INDIVIDUAL DEFENDANTS)

304.    Relators repeat and reallege the allegations set forth in paragraphs 1 through 303 as if fully set forth herein.

305.    By virtue of the acts described above, Defendants knowingly presented, or caused to be presented to an officer or employee of a Montana governmental entity, a false or fraudulent claim for payment or approval, in violation of Mont. Code Ann. § 17-8-403(l)(a).

306.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used, a false record or statement to obtain payment or approval of a claim by governmental entities of the State of Montana, in violation of Mont. Code Ann. § 17-8-403(l)(b).

307.    The State of Montana, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants as alleged herein.

308.    By reason of Defendants' acts, the State of Montana has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

309.    Pursuant to Mont. Code Ann. § 17-8-403(2), the State of Montana is entitled to three times the amount of actual damages plus the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## TWENTIETH CAUSE OF ACTION
## NEVADA FALSE CLAIMS ACT
## NEV. REV. STAT. §§ 357, *ET SEQ.*
## (AGAINST AEGERION AND THE INDIVIDUAL DEFENDANTS)

310.     Relators repeat and reallege the allegations set forth in paragraphs 1 through 309 as if fully set forth herein.

311.     By virtue of the acts described above, Defendants knowingly presented or caused to be presented to the State of Nevada a false claim for payment or approval, in violation of Nev. Rev. Stat. § 357.040(1)(a).

312.     By virtue of the acts described above, Defendants knowingly made or used, or caused to be made or used, a false record or statement to obtain payment or approval by the State of Nevada of a false claim, in violation of Nev. Rev. Stat. § 357.040(1)(b).

313.     The State of Nevada, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants as alleged herein.

314.     By reason of Defendants' acts, the State of Nevada has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

315.     Pursuant to Nev. Rev. Stat. § 357.040(1), the State of Nevada is entitled to three times the amount of actual damages plus the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## TWENTY-FIRST CAUSE OF ACTION
## NEW JERSEY FALSE CLAIMS ACT
## N.J. STAT. ANN. § 2A:32C-1, *ET SEQ.*
## (AGAINST AEGERION AND THE INDIVIDUAL DEFENDANTS)

316.     Relators repeat and reallege the allegations set forth in paragraphs 1 through 315 as if fully set forth herein.

317.     By virtue of the acts described above, Defendants knowingly presented, or caused to be presented to an employee, officer or agent of the State of New Jersey or any contractor, grantee or recipient of New Jersey state funds, a false or fraudulent claim for payment or approval, in violation of N.J. Stat. Ann. § 2A:32-C3a.

318.     By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used, a false record or statement to get a false or fraudulent claim paid by the State of New Jersey, in violation of N.J. Stat. Ann. § 2A:32-C3b.

319.     The State of New Jersey, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants as alleged herein.

320.     By reason of Defendants' acts, the State of New Jersey has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

321.     Pursuant to N.J. Stat. Ann. § 2A:32-C3, the State of New Jersey is entitled to three times the amount of actual damages plus the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

**TWENTY-SECOND CAUSE OF ACTION**
**NEW MEXICO MEDICAID FALSE CLAIMS ACT**
**N.M. STAT. ANN. § 27-14-1, *ET SEQ.***
**(AGAINST AEGERION AND THE INDIVIDUAL DEFENDANTS)**

322.    Relators repeat and reallege the allegations set forth in paragraphs 1 through 321 as if fully set forth herein.

323.    By virtue of the acts described above, Defendants presented, or caused to be presented, to the State of New Mexico a claim for payment under the Medicaid program knowing that such claim is false or fraudulent, in violation of N.M.S.A. § 27-14-4(A).

324.    By virtue of the acts described above, Defendants made, used or caused to be made or used a record or statement to obtain a false or fraudulent claim under the Medicaid program paid for or approved by the State of New Mexico knowing such record or statement is false, in violation of N.M.S.A. § 27-14-4(C).

325.    The State of New Mexico, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants as alleged herein.

326.    By reason of Defendants' acts, the State of New Mexico has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

327.    Pursuant to N.M.S.A. § 27-14-4, the State of New Mexico is entitled to three times the amount of actual damages plus the maximum penalty which may be applicable for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

**TWENTY-THIRD CAUSE OF ACTION**
**NEW YORK FALSE CLAIMS ACT**
**N.Y. STATE FIN. LAW §§ 187, *ET SEQ.***
**(AGAINST AEGERION AND THE INDIVIDUAL DEFENDANTS)**

328.     Relators repeat and reallege the allegations set forth in paragraphs 1 through 327 as if fully set forth herein.

329.     By virtue of the acts described above, Defendants knowingly presented, or caused to be presented, to employees, officers or agents of New York or New York local governments, false or fraudulent claims for payment or approval, in violation of N.Y.  Fin. Law § 189.1(a).

330.     By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State of New York or a New York local government, in violation of N.Y. Fin. Law § 189.1 (b).

331.     The State of New York, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants as alleged herein.

332.     By reason of Defendants' acts, the State of New York has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

333.     Pursuant to N.Y. Fin. Law § 189.1(g), the State of New York is entitled to three times the amount of actual damages plus the maximum penalty of $12,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## TWENTY-FOURTH CAUSE OF ACTION
## NORTH CAROLINA FALSE CLAIMS ACT
## N.C. GEN. STAT. § 1-605, *ET SEQ.*
## (AGAINST AEGERION AND THE INDIVIDUAL DEFENDANTS)

334.    Relators repeat and reallege the allegations set forth in paragraphs 1 through 333 as if fully set forth herein.

335.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented to an officer or employee of a North Carolina agency a false claim for payment or approval, in violation of N.C.G.S. § 1-607(a)(1).

336.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used a false record or statement to get a false or fraudulent claim paid or approved by a North Carolina agency, in violation of N.C.G.S. § 1-607(a) (2).

337.    The State of North Carolina, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants as alleged herein.

338.    By reason of Defendants' acts, the State of North Carolina has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

339.    Pursuant to N.C.G.S. § 1-607(a), the State of North Carolina is entitled to three times actual damages plus the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

**TWENTY-FIFTH CAUSE OF ACTION**
**OKLAHOMA MEDICAID FALSE CLAIMS ACT**
**OKLA. STAT. § 63-5053, *ET SEQ.***
**(AGAINST AEGERION AND THE INDIVIDUAL DEFENDANTS)**

340.     Relators repeat and reallege the allegations set forth in paragraphs 1 through 339 as if fully set forth herein.

341.      By virtue of the acts described above, Defendants knowingly presented or caused to be presented to officers or employees of the State of Oklahoma a false claim for payment or approval, in violation of Okla. Stat. § 63-5053.1B1.

342.     By virtue of the acts described above, Defendants knowingly made or used, or caused to be made or used, a false record or statement to obtain payment or approval by the State of Oklahoma of a false claim, in violation of Okla. Stat. § 63-5053.1B2.

343.     Oklahoma, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants as alleged herein.

344.     By reason of Defendants' acts, the State of Oklahoma has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

345.     Pursuant to Okla. Stat. § 63-5053.1B, the State of Oklahoma is entitled to three times the amount of actual damages plus the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

**TWENTY-SIXTH CAUSE OF ACTION**
**RHODE ISLAND FALSE CLAIMS ACT**
**R.I. GEN. LAWS § 9-1.1, *ET SEQ.***
**(AGAINST AEGERION AND THE INDIVIDUAL DEFENDANTS)**

346.     Relators repeat and reallege the allegations set forth in paragraphs 1 through 345 as if fully set forth herein.

347.     By virtue of the acts described above, Defendants knowingly presented or caused to be presented to officers or employees of the State of Rhode Island false claims for payment or approval, in violation of R.I. Gen. Laws § 9-1.1-3(a)(1).

348.     By virtue of the acts described above, Defendants knowingly made or used, or caused to be made or used, false records or statements to obtain payment or approval by the State of Rhode Island of false claims, in violation of R.I. Gen. Laws § 9-1.1-3(a)(2).

349.     The State of Rhode Island, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants as alleged herein.

350.     By reason of Defendants' acts, the State of Rhode Island has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

351.     Pursuant to R.I. Gen. Laws § 9-1.1-3(a), the State of Rhode Island is entitled to three times the amount of actual damages plus the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## TWENTY-SEVENTH CAUSE OF ACTION
## TENNESSEE MEDICAID FALSE CLAIMS ACT
## TENN. CODE § 71-5-181, *ET SEQ.*
## (AGAINST AEGERION AND THE INDIVIDUAL DEFENDANTS)

352.    Relators repeat and reallege the allegations set forth in paragraphs 1 through 351 as if fully set forth herein.

353.    By virtue of the acts described above, Defendants presented, or caused to be presented, to the State of Tennessee a claim for payment under the Medicaid program knowing such claim is false or fraudulent, in violation of Tenn. Code § 71-5-182(a)(l)(A).

354.    By virtue of the acts described above, Defendants made, used, or caused to be made or used, a record or statement to get a false or fraudulent claim under the Medicaid program paid for or approved by the State of Tennessee knowing such record or statement is false, in violation of Tenn. Code § 71-5-182(a)(1)(B).

355.    The State of Tennessee, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants as alleged herein.

356.    By reason of Defendants' acts, the State of Tennessee has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

357.    Pursuant to Tenn. Code § 71-5-182(a)(1), the State of Tennessee is entitled to three times the amount of actual damages plus the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

**TWENTY-EIGHTH CAUSE OF ACTION**
**TEXAS MEDICAID FRAUD PREVENTION LAW**
**TEX. HUM. RES. CODE § 36.001, *ET SEQ.***
**(AGAINST AEGERION AND THE INDIVIDUAL DEFENDANTS)**

358.     Relators repeat and reallege the allegations set forth in paragraphs 1 through 357 as if fully set forth herein.

359.     By virtue of the acts described above, Defendants knowingly presented or caused to be presented false or fraudulent claims to the State of Texas for payment or approval, in violation of Tex. Hum. Res. Code § 36.002.

360.     By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the State of Texas to approve and pay such false and fraudulent claims, in violation of Tex. Hum. Res. Code § 36.002.

361.     Texas, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants as alleged herein.

362.     By reason of Defendants' acts, the State of Texas has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

363.     Pursuant to, in violation of Tex. Hum. Res. Code § 36.052, the State of Texas is entitled to two times the amount of actual damages plus the maximum penalty of $15,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## TWENTY-NINTH CAUSE OF ACTION
## VIRGINIA FRAUD AGAINST TAXPAYERS ACT
## VA. CODE § 8.01-216.1, *ET SEQ.*
## <u>(AGAINST AEGERION AND THE INDIVIDUAL DEFENDANTS)</u>

364.     Relators repeat and reallege the allegations set forth in paragraphs 1 through 363 as if fully set forth herein.

365.     By virtue of the acts described above, Defendants knowingly presented, or caused to be presented, to an officer or employee of the Commonwealth of Virginia a false or fraudulent claim for payment or approval, in violation of Va. Code § 8.01-216.3(A)(l).

366.     By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Commonwealth of Virginia in violation of Va. Code § 8.01-216.3(A)(2).

367.     The Commonwealth of Virginia, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants as alleged herein.

368.     By reason of Defendants' acts, the Commonwealth of Virginia has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

369.     Pursuant to Va. Code § 8.01-216.3(A), the Commonwealth of Virginia is entitled to three times the amount of actual damages plus the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## THIRTIETH CAUSE OF ACTION
## WASHINGTON MEDICAID FRAUD FALSE CLAIMS ACT
## WASH. REV. CODE § 74.66.020, *ET SEQ.*
## (AGAINST AEGERION AND THE INDIVIDUAL DEFENDANTS)

370.     Relators repeat and reallege the allegations set forth in paragraphs 1 through 369 as if fully set forth herein.

371.     By virtue of the acts described above, Defendants knowingly presented, or caused to be presented, to an officer or employee or agent of the State of Washington a false claim for medical assistance in violation of Wash. Rev. Code § 74.66.020(1)(a).

372.     By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used, a false record or statement to obtain approval or payment of a false claim for medical assistance by the State of Washington in violation of Wash. Rev. Code § 74.66.020 (1)(b).

373.     The State of Washington, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants as alleged herein.

374.     By reason of Defendants' acts, the State of Washington has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

375.     Pursuant to Wash. Rev. Code § 74.66.020(1), the State of Washington is entitled to three times the amount of actual damages plus the maximum penalty of $11,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

**THIRTY-FIRST CAUSE OF ACTION**
**WISCONSIN FALSE CLAIMS FOR MEDICAL ASSISTANCE LAW**
**WIS. STAT. § 20.931, *ET SEQ.***
**(AGAINST AEGERION AND THE INDIVIDUAL DEFENDANTS)**

376.     Relators repeat and reallege the allegations set forth in paragraphs 1 through 375 as if fully set forth herein.

377.      By virtue of the acts described above, Defendants knowingly presented, or caused to be presented, to an officer or employee or agent of the State of Wisconsin a false claim for medical assistance in violation of Wis. Stat. § 20.931(2)(a).

378.     By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used, a false record or statement to obtain approval or payment of a false claim for medical assistance by the State of Wisconsin in violation of Wis. Stat. § 20.931(2)(b).

379.     The State of Wisconsin, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants as alleged herein.

380.     By reason of Defendants' acts, the State of Wisconsin has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

381.      Pursuant to Wis. Stat. § 20.931(2), the State of Wisconsin is entitled to three times the amount of actual damages plus the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## THIRTY-SECOND CAUSE OF ACTION
## DISTRICT OF COLUMBIA FALSE CLAIMS ACT
## D.C. CODE § 2-381.01, *ET SEQ.*
## (AGAINST AEGERION AND THE INDIVIDUAL DEFENDANTS)

382.    Relators repeat and reallege the allegations set forth in paragraphs 1 through 381 as if fully set forth herein.

383.    By virtue of the acts described above, Defendants knowingly presented, or caused to be presented, to an officer or employee of the District of Columbia a false claim for payment or approval, in violation of D.C. Code § 2-308.14(a)(1).

384.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used, a false record or statement to get a false claim paid or approved by the District of Columbia, in violation of D.C. Code § 2-308.14(a)(2).

385.    The District of Columbia, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants as alleged herein.

386.    By reason of Defendants' acts, the District of Columbia has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

387.    Pursuant to D.C. Code § 2-308.14(a), the District of Columbia is entitled to three times the amount of actual damages plus the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## THIRTY-THIRD CAUSE OF ACTION
## VICARIOUS LIABILITY
## (AGAINST UPENN)

388.　Relators repeat and reallege all of the allegations set forth in paragraphs 1 through 387 as though set forth herein.

389.　At all times relevant to this complaint Defendant Dr. Rader was employed by Defendant UPenn.  Defendant Dr. Rader was under UPenn's direct supervision and control when he committed the wrongful acts described herein.  Dr. Rader engaged in these acts while in the course and scope of his employment.  Dr. Rader's wrongful acts were foreseeable and UPenn knew or should have known of the wrongful acts.  As more fully described *supra*, Dr. Rader helped promote Juxtapid and Aegerion by appearing at medical conferences and Aegerion's executives continued to cite to Dr. Rader as an expert in the field and promoted upon his assertions that HoFH was more prevalent than supported by the medical literature.

390.　UPenn is liable for Dr. Rader's wrongful acts under the law of vicarious liability, including the doctrine of respondeat superior.

## THIRTY-FOURTH CAUSE OF ACTION
## UNJUST ENRICHMENT
## (AGAINST UPENN)

391.　Relators repeat and reallege the allegations contained in Paragraphs 1 through 390 as if fully set forth herein.

392.　As set forth above, UPenn received funds, in the form of royalties and other payments from Aegerion directly resulting from Aegerion's off-label marketing practices which defrauded the United States, State Plaintiffs and the District (collectively "Government Funds").

393.     The Government Funds received by Aegerion unlawfully and thereafter paid to UPenn have been retained by UPenn, and should, in equity and good conscience, be returned to the United States, State Plaintiffs and the District with interest and costs.

394.     Accordingly, UPenn is liable to the United States, State Plaintiffs and the District in an amount to be determined at trial of this matter, plus all interest and costs applicable thereto.

## IX.     PRAYER FOR RELIEF

**WHEREFORE,** the Relators, on behalf of the United States, the State Plaintiffs, the District and themselves, hereby pray that this Court:

A.     Enter judgment against Defendants holding them liable for three times the amount of damages sustained by the United States because of the acts of Defendants;

B.     Enter judgment against Defendants holding them liable for the maximum civil penalty for each violation of the FCA committed by Defendants;

C.     Enter judgment against Defendants awarding the Relators a percentage of the proceeds recovered by the United States as a result of this action in accordance with 31 U.S.C. § 3730(d);

D.     Enter judgment against Defendants holding them liable for the damages sustained by the Plaintiff States and the District because of their acts as described herein, multiplied as permitted, under the false claims acts of the Plaintiff States and the District;

E.     Enter judgment against Defendants awarding the Relators a percentage of the proceeds recovered by the Plaintiff States and the District as a result of this action in accordance with their false claims acts;

F.     Enter judgment against Defendants awarding the Relators their costs and reasonable attorneys' fees for prosecuting this action in accordance with 31 U.S.C. § 3730(d), and

G.     Enter judgment against Defendants awarding any and all other relief that the

Court finds to be just and equitable.

## X.     DEMAND FOR JURY TRIAL

Relators demand a jury trial on all claims alleged herein.

Dated: September 27, 2017                    Respectfully submitted,


*/s/ Patrick T. Egan*
Bryan A. Wood, Esq. (BBO #648414)
Patrick T. Egan, Esq. (BBO #637477)
Stephen Ryan, Jr., Esq. (BBO #669727)
**BERMAN TABACCO**
One Liberty Square
Boston, MA  02109
Tel.:  617-542-8300
Fax:  617-542-1194
pegan@bermantabacco.com
bwood@bermantabacco.com
sryan@bermantabacco.com

Royston H. Delaney, Esq. (BBO #655666)
Ilyas J. Rona, Esq. (BBO #642964)
**DELANEY KESTER LLP**
50 Congress Street, #600
Boston, MA  02109
Tel.:  857-498-0384
royston@delaneykester.com
ilyas@delaneykester.com

*- and -*

Charles F. Kester, Esq.
**DELANEY KESTER LLP**
4505 Las Virgenes Road, Suite 203
Calabasas, CA  91302
Tel.:  818-974-8627
charles@delaneykester.com

***Attorneys for Plaintiffs-Relators***


- 102 -